Larry KLAYMAN, Appellant,

v.

David SEGAL, et al., Appellees.

No. 00–CV–896.

District of Columbia Court of Appeals.

Argued April 12, 2001.
Decided Oct. 18, 2001.

Larry Klayman, pro se.

Kevin T. Baine, Washington, DC, with whom Margaret A. Keeley was on the brief, for appellees.

Before STEADMAN, SCHWELB and REID, Associate Judges.

REID, Associate Judge:

Appellant Larry Klayman challenges the trial court's dismissal, under Super. Ct. Civ. R. 12(b)(6) (2000) (failure to state a claim upon which relief may be granted), of his amended complaint alleging defamation and false light invasion of privacy against appellees (David Segal and The Washington Post). He filed a timely notice of appeal, contending that, contrary to the trial court's conclusion, a statement[1] in an October 25, 1999, article published in The Washington Post and written by Mr. Segal: (a) "is reasonably capable of being understood in a defamatory sense" because it "falsely caused [him] to appear so bent on publicity for himself that he is insensitive to the murder of innocent children . . . ."; and (b) places him in a false light

that would be "offensive to any reasonable person." We hold, although it is a fairly close call, that when read in context, a reasonable person of ordinary intelligence would not understand the fair and natural meaning of the statement in question to be that Mr. Klayman is insensitive to the murder of innocent children. Thus, as a matter of law, the statement is neither reasonably capable of defamatory meaning, nor does it place Mr. Klayman in a highly offensive light.

## FACTUAL SUMMARY

Mr. Klayman, self-described as "the founder and General Counsel of a conservative pro-life ethics organization and public interest law firm, Judicial Watch, Inc.,"[2] was the subject of a series of articles appearing in The Washington Post, entitled "Klayman's Chronicles."[3] In his amended complaint against Mr. Segal and The Washington Post, he alleged that the articles were "intended to ridicule, embarrass and defame [him] and hold [him] in a false light." In particular, he complained about an article appearing under Mr. Segal's byline on October 25, 1999, in the business section of the newspaper. The article, "Guess Who's on the Line," reads in full:

Ever wonder how Larry Klayman ends up on so many television talk shows? No question, he's a spigot of

---

1. The statement in question reads: "If there was a school shooting, he'd say, 'So what? We're doing important things here.' "

2. Mr. Klayman's amended complaint asserts that: "[T]he public interest law firm . . . is dedicated to furthering honest government and respect for the law, and fighting government corruption."

3. Although Mr. Klayman's amended complaint refers to "numerous disparaging articles" about him in The Washington Post, particularly those published under the heading 'Klayman's Chronicles,' [which] appear ap-

proximately every two (2) weeks in the 'Washington Hearsay' page of The Washington Post's Monday Business Section, the record on appeal contains only two articles concerning Mr. Klayman, the October 25, 1999 article by Mr. Segal, and a February 14, 2000 article by James V. Grimaldi entitled, "Help Wanted," which references the approaching end of the Clinton Presidency, states that Mr. Klayman is among "those who made careers out of the Clinton administration scandals," and asks readers to "help [ ] find a new job for [Mr.] Klayman."

political opinions, and as chairman of Judicial Watch—a nonprofit that has sued the Clinton administration more than a dozen times—he knows how to fulminate about the commander in chief. Sometimes Klayman even brings his own videotape, lifted from recent depositions in his office. To producers, he's like a dinner guest who brings the meal, then cooks it.

But there's more in Klayman's television omnipresence than good soundbites. He's also a master, it turns out, at old-fashioned badgering. According to a former employee, Klayman demanded that his public relations person call a handful of talk show producers every single day, rain or shine, regardless of the day's news.

"He would come in each morning and ask, 'Who have you called and why haven't you called?' " said the one[-]time employee, who requested anonymity. "If the show was doing Hollywood that night, he'd say call anyway. If they were doing Tiananmen Square he'd say, 'Well, I'm an international lawyer, try to pitch that.' If there was a school shooting he'd say, 'So what? We're doing important things here.' "

The nonstop barrage can get a little wearying for producers. "In his world, he wants the Klayman News Network," said one producer at a 24–hour news network. "His people call a few times a day. He wants to be on at 1 o'clock, 2 o'clock and 3 o'clock."

For anyone who can't wait for the next Klayman cameo, there's a growing line of Judicial Watch apparel, now for sale on the organization's web site. Products include the "JW Pinstripe Henley," a shirt that features a "100 percent cotton pinstripe body with contrast color collarette, placket and sleeves dyed to match buttons. White/Navy

Sizes M 2XL, $30.00[.]" There are also a JW "swat team" style windbreaker, poplin jacket, pique polo shirt; a couple of JW watches, and a mug and a paperweight.

During the hearing on the motion to dismiss his amended complaint, the trial judge asked Mr. Klayman to identify the section of the article that he contended was defamatory. He responded, in part:

[A]n article must be read in total context. . . . But the specific statement that pushes this thing over the top into the area of being defamatory is "if there was a school shooting he'd say[,] '[S]o what[?] [W]e're doing important things here[.] . . .' " That statement is totally one hundred percent false. I even submitted to a polygraph examination to show Your Honor that. . . . Larry Klayman and Judicial Watch are a public interest law firm that believes in ethics, Judeo Christian ethics, family values. . . . [T]his was a series called the Klayman Chronicles. . . . No lawyer that I know of has ever been subjected to a series which runs almost every two weeks and tries to make him ridiculous and odious and stupid in front of courts. . . . It is intended to try to make Larry Klayman look as if he's so bent on publicity he'll bring any lawsuit at any time and he doesn't even care about the death of innocent children because all he wants is publicity and to make money and to go on with his public interest law firm called Judicial Watch. That is defamatory particularly in the context that we are pro-life, we are pro-family, we represent groups such as Focus on the Family, . . . we represent the moral majority of Dr. Falwell. And it was intended to humiliate Larry Klayman, and to defame me to say I don't care about young children being killed.

Counsel for appellees disagreed with Mr. Klayman's interpretation of the article. He stated that, read in context, the article "means that Mr. Klayman tried to get on talk shows all the time, in the words of the column, regardless of the day's news because he regards his work as important." Asked to address Mr. Klayman's pro-family argument, counsel for appellees responded, in part:

It is completely unreasonable to read this column to mean that Mr. Klayman in his heart doesn't care whether innocent children are murdered. That's not what it says. What it says is in essence that he didn't regard a school shooting as a reason to suspend his activities. He didn't think it was a reason to refrain from calling up talk shows to try to arrange appointments....

I don't think it's defamatory to say of somebody that you're sensitive about something, that is not disgraceful, odious, to be a less than sensitive person.... The Post didn't say Mr. Klayman is insensitive....

In addition to Mr. Klayman's pro-family argument, the trial judge asked counsel for appellees to focus on the "[s]o what?" statement in the article. He replied, in part:

Again, you can't read those words alone, you must read them in connection with the rest of the column. In context they don't mean so what[,] I don't care whether anybody got murdered yesterday and it's a matter of moral indifference to me whether innocent children are slaughtered or not. It means so what does that have to do with my request to you to call up a television talk show, that is not a reason to suspend our activities today.

Later, when the trial judge expressed doubt as to where the article implied that Mr. Klayman did not "care about innocent children," Mr. Klayman retorted: "It's in the plain language of the word. If there was a school shooting he'd say 'so what.' "

The trial judge granted appellees' motion to dismiss, stating, in pertinent part:

The issue before the Court is whether—accepting the allegations of the Complaint as true and that the school shootings statement was not made by the plaintiff—the article is reasonably capable of a defamatory meaning, under District of Columbia law. Although Mr. Klayman argues that the statement makes him appear "insensitive to the murder of innocent children," that is clearly not the meaning of the statement in the context of the article. The article does not say, directly or by implication, that Mr. Klayman does not care about the murder of children or about school shootings (or about Hollywood or Tiananm[e]n Square). What it conveys is that Mr. Klayman believes his work to be important and to warrant media attention and talk show appearances, on a par with other major news stories, including school shootings and notable international events. Mr. Klayman does not dispute that he considers his activities to warrant significant media attention. He makes much in his pleadings and other submissions in this case of his dedication to investigating and exposing corruption in government, and he does not deny that he has made a concerted effort to obtain media coverage for his positions and for the activities of Judicial Watch. The statement in the article is only capable of a defamatory meaning if it is taken out of context, which the law neither requires nor permits....

For the [same] reasons ..., the Court does not find that the challenged statement, in context, reasonably can support the plaintiff's false light claim. It does not place Mr. Klayman in a false light

that would be offensive to a reasonable person to suggest that he believes his work is important enough to warrant continuing media coverage, even when other events as significant as school shootings may also be in the news.

## ANALYSIS

Mr. Klayman contends that the trial court erred in concluding that The Washington Post article "does not say, directly or by implication, that Mr. Klayman does not care about the murder of children or about school shootings (or about Hollywood or Tiananm[e]n Square)." Citing *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 877 (D.C.1998), he argues that: "Whether the statements at issue here were understood in this defamatory sense—and [Mr. Klayman] submits that [they were]—is a question of fact that only a jury can resolve." In addition, he challenges the trial court's conclusion concerning his invasion of privacy/false light claim, maintaining that: "Any reasonable person, much less the head of a conservative, pro-life ethics organization and public interest law firm, would be offended by the false light in which [Mr. Klayman] was placed." Appellees assert that the trial court may properly "determine[ ](a) whether a communication is capable of bearing a particular meaning, and (b) whether that meaning is defamatory." In addition, they contend that The Washington Post article at issue in this case "is not reasonably capable of any defamatory or highly offensive meaning," [and] "as a mat-

ter of law[,] it is not actionable and dismissal is warranted."

 We review this Rule 12(b)(6) matter *de novo* because it is a question of law. *See Wallace, supra*, 715 A.2d at 877 (citing *Abdullah v. Roach*, 668 A.2d 801, 804 (D.C.1995) (other citation omitted)); *see also Weyrich v. The New Republic, Inc.*, 344 U.S.App.D.C. 245, 251, 235 F.3d 617, 623 (2001) (citing *Taylor v. F.D.I.C.*, 328 U.S.App.D.C. 52, 60, 132 F.3d 753, 761 (D.C.Cir.1997)). We dismiss a complaint for failure to state a claim for which relief can be granted only if "it is beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief." *Wallace, supra*, 715 A.2d at 877 (citing *Abdullah, supra*, 668 A.2d at 804 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957))). "The allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiff and, if these allegations are sufficient, the case must not be dismissed even if the court doubts that the plaintiff will ultimately prevail." *Id.* (citing *Atkins v. Industrial Telecomms. Ass'n, Inc.*, 660 A.2d 885, 887 (D.C.1995) (citations omitted)).

 We will not dismiss a complaint under Rule 12(b)(6) which alleges defamation[4] if "the communications of which the plaintiff complains were reasonably susceptible of a defamatory meaning." *Id.* at 875; *see also Weyrich, supra*, 344 U.S.App.D.C. at 255, 235 F.3d at 627 ("Whether a statement is capable of de-

---

4. "A plaintiff bringing a defamation action ... must show: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of

special harm or that its publication caused the plaintiff special harm." *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C.2001) (citing *Crowley v. North Am. Telecomms. Ass'n*, 691 A.2d 1169, 1173 n. 2 (D.C.1997) (quoting *Prins v. International Tel. and Tel. Corp.*, 757 F.Supp. 87, 90 (D.D.C.1991) (internal quotations omitted))).

famatory meaning is a question of law, but 'it is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous.' ") (quoting *White v. Fraternal Order of Police*, 285 U.S.App. D.C. 273, 279, 909 F.2d 512, 518 (D.C.Cir. 1990) (quoting *Levy v. American Mut. Ins. Co.*, 196 A.2d 475, 476 (D.C.1964))). " '[A] statement is defamatory if it tends to injure [the] plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.' " *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C.2000) (emphasis in original) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 988 (D.C.1984)); *see also Weyrich, supra*, 344 U.S.App.D.C. at 255, 235 F.3d at 627 (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 267 U.S.App.D.C. 337, 343–44, 838 F.2d 1287, 1293–94 (D.C.Cir. 1988) (quoting *Best, supra*, 484 A.2d at 988)). In addition, a plaintiff must establish the falsity of the statement by a preponderance of the evidence. *Moldea v. New York Times Co.*, 304 U.S.App.D.C. 406, 411, 15 F.3d 1137, 1142 (1994) (*Moldea I* ) (citation omitted), *modified*, 306 U.S.App.D.C. 1, 22 F.3d 310 (1994) (*Moldea II* ), *cert. denied*, 513 U.S. 875, 115 S.Ct. 202, 130 L.Ed.2d 133 (1994).[5]

 "[A]n allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiffs appear 'odious, infamous, or ridiculous.' " *Best, supra*, 484 A.2d at 989

(quoting *Johnson v. Johnson Publ'g Co.*, 271 A.2d 696, 697 (D.C.1970)). "If it appears that the statements are at least capable of a defamatory meaning, whether they were defamatory and false are questions of fact to be resolved by the jury."[6] *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C.1990) (citing *Olinger v. American Sav. & Loan Ass'n*, 133 U.S.App.D.C. 107, 109, 409 F.2d 142, 144 (1969) (per curiam)).

 "The plaintiff has the burden of proving the defamatory nature of [a challenged] publication (citation omitted), and the publication must be considered as a whole, in the sense in which it would be understood by the readers to whom it was addressed." *Best, supra*, 484 A.2d at 989 (citing *Afro–American Publ'g Co. v. Jaffe*, 125 U.S.App.D.C. 70, 76, 366 F.2d 649, 655 (1966) (en banc)) (internal citation omitted). However, when presented with a Rule 12(b)(6) motion to dismiss a defamation action, "we must assume, as the complaint alleges, the falsity of any express or implied factual statements made in the article" at issue, *Weyrich*, 344 U.S.App. D.C. at 251, 235 F.3d at 623, and "[w]e must also assume that such statements were made by appellees with knowledge of their falsity or reckless disregard for their truth." *Id.* (citation omitted).

 "An invasion of privacy—false light claim requires a showing of: 1) publicity 2) about a false statement, representation or imputation 3) understood to be of and concerning the plaintiff, and 4) which places the plaintiff in a false light that

---

**5.** Because prolonged litigation in defamation actions against media defendants may inhibit free speech, summary judgment is a useful method of disposing of such actions where the requirements of Rule 56 are satisfied. *See Guilford Transp. Indus., supra*, 760 A.2d at 592 (citations omitted). Indeed, in the First Amendment area, summary procedures are essential. *Id.*

**6.** *See* 3 RESTATEMENT SECOND, TORTS, § 614:

 (1) The court determines
 (a) whether communication is capable of bearing particular meaning, and
 (b) whether that meaning is defamatory.
 (2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient.

would be [highly] offensive to a reasonable person." *Kitt v. Capital Concerts, Inc.,* 742 A.2d 856, 859 (D.C.1999) (referencing RESTATEMENT (SECOND) OF TORTS § 652E (1977));[7] *see also Vassiliades v. Garfinckel's,* 492 A.2d 580, 587 (D.C.1985). Thus, "before finding that a statement is not actionable, because it is not reasonably capable of defamatory meaning, [the trial court] must also satisfy itself that the statement does not arguably place appellant in a 'highly offensive' false light." *Weyrich, supra,* 344 U.S.App.D.C. at 256, 235 F.3d at 628.

■■■ In order to determine whether the challenged article about Mr. Klayman, which appeared in The Washington Post, is capable of defamatory meaning, we focus now on the legal principle that, "the publication must be considered as a whole, in the sense it would be understood by the readers to whom it was addressed." *Best, supra,* 484 A.2d at 989 (citation omitted). This legal principle embodies certain critical legal concepts: (1) context, (2) plain or fair and natural meaning of the words used, and (3) average or common mind or ordinary and common acceptance. "Context" is a critical legal concept for determining whether, as a matter of law, a statement is reasonably capable or susceptible of a defamatory meaning. *See Moldea II, supra,* 306 U.S.App.D.C. at 4–6, 22 F.3d at 313–15; RESTATEMENT OF TORTS (SECOND), § 563, comment *e.* "Context" serves as a constant reminder that a statement in an article may not be isolated and then pronounced defamatory, or deemed capable of a defamatory meaning. Rather, any single statement or statements must be examined within the context of the entire article. As the Supreme Judicial Court of Massachusetts has stated, the concept of context "requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence." *Foley v. Lowell Sun Publ'g Co.,* 404 Mass. 9, 533 N.E.2d 196, 197 (1989) (citations omitted).

Context was important in reaching our decision in *Wallace, supra,* which in part concerned a defamation action by a terminated attorney against her former law firm. There, the appellant identified certain statements as capable of a defamatory meaning, including the following: "[T]he plaintiff was frequently out of the office during office hours." *Id.* at 877. We emphasized that: "An allegation that an attorney is often out of the office during normal working hours, although perhaps inconclusive on its face, could reasonably be construed, in context, as a reflection on her professional performance." *Id.* at 878 (footnote omitted).

Similarly, context was significant in *Foley, supra.* There, the subject was an eight-sentence article which appeared in a Lowell, Massachusetts newspaper. The headline read: "Police log [—] Officer assaulted; two men charged," and the first sentence of the article stated: "Two Lowell men who claimed their store had been robbed were arrested this morning after assaulting a police officer when he arrived on the scene." *Id.* at 199. Appellant sued

---

7. Section 652E states:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

the newspaper, alleging defamation. The court declared:

> After examining the complained—of statement in the context of the entire article—which included both the feature heading "Police log," and the headline which clearly indicates that the two men were *charged* with assaulting an officer, as well as five statements of attribution of facts to the police within the eight sentences devoted to the incident involving [appellant]—we decide that a reasonable reader could not conclude that the Sun was accusing [the appellant] of assaulting the officer. When the statement is read in the context of the article as a whole, its clear meaning is to report that [the appellant] was arrested for assaulting an officer—and not that he either had been convicted of the offense or had actually committed the assault.

*Id.* at 197 (citations omitted).

*Weyrich, supra,* is also instructive regarding the concept of "context." 344 U.S.App.D.C. at 248, 235 F.3d at 620. There, the District of Columbia Circuit considered both the political and behavioral context of an article about Mr. Weyrich to determine whether it was reasonably capable of "attribut[ing] to [him] a diagnosable mental illness[,][p]aranoia...." *Weyrich,* 344 U.S.App.D.C. at 248, 235 F.3d at 620. Following its examination of the full article, the court said, in part:

> Admittedly, the article paints an unflattering picture of appellant. Indeed, it uses examples of his "famous temper" to shade the line between political extremism and personal extremism, suggesting that the alleged irrationality of the conservative right runs deeper than mere ideology. But the article's suggestion that appellant's behavior exhibited "paranoia" is rhetorical sophistry, not a verifiable false attribution *in fact* of a "debilitating mental condition".... Nev-

er does the article claim to make a psychological pronouncement, nor would a reasonable reader understand it to do so.... Presented in such a loose manner, in such a well-understood context, the article's reference to "bouts of ... paranoia" is neither verifiable nor does it imply specific defamatory facts about appellant.

*Weyrich,* 344 U.S.App.D.C. at 253, 235 F.3d at 625 (citations omitted) (emphasis in original). Nonetheless, the court went on to examine other portions of the article, in context, and concluded that a remand for further proceedings was necessary because: "If indeed the story is fabricated, we cannot say that it is not reasonably capable of any defamatory meaning—it arguably makes appellant appear highly volatile, irrational, unsound and otherwise 'odious, infamous, or ridiculous.' " *Id.* at 255, 235 F.3d at 627.

At issue in *MacElree v. Philadelphia Newspapers, Inc.,* 544 Pa. 117, 674 A.2d 1050 (1996) was an article in the Philadelphia Inquirer about an incident that took place on the campus of an historically black educational institution, Lincoln University, between non-students and students. The article stated in part:

> Writing to a local newspaper, [University President] Sudarkasa questioned remarks by the Chester County district attorney that one of the New Yorkers had been stabbed. When D.A. James MacElree replied with quotations from police reports, the university's lawyer, Richard Glanton, accused him of electioneering—"the David Duke of Chester County running for office by attacking Lincoln."

*Id.* at 1052 (alteration in the original). Mr. MacElree, who later became a judge, sued the owner of the Philadelphia Inquirer, alleging defamation because "the David Duke" remark was not made by Mr. Glan-

ton, and "the article portrays him as 'abusing his prosecutorial office by harassing a black college in order to ingratiate himself with the white voters in Chester County.' " *Id.* at 1053. In essence, he asserted that the article accused him of racism. Although a Pennsylvania Superior Court determined that, read in context, the challenged statement was not capable of defamatory meaning, the Supreme Court of Pennsylvania held that appellant's defamation action should not have been dismissed with prejudice because:

> The [David Duke] statement ... could be interpreted as more than a simple accusation of racism.... [T]he statement could be construed to mean that appellant was acting in a racist manner in his official capacity as district attorney.... Although accusations of racism have been held not to be actionable defamation [under Pennsylvania law], it cannot be said that every such accusation is not capable of defamatory meaning as a matter of law.

*Id.* at 1055.

Before considering the context of the article about Mr. Klayman, we emphasize the second part of the critical legal principle found in *Best, supra:* "[T]he publication must be considered as a whole, *in the sense in which it would be understood by the readers to whom it was addressed.*" *Id.* at 989 (citations omitted) (emphasis added). In *Guilford Transp. Indus., Inc., supra,* we stressed that: "The statements at issue should not be 'interpreted by extremes, but should be construed as the average or common mind would naturally understand [them].' " 760 A.2d at 594 (quoting 8 S. SPEISER, C. KRAUSE & A. GANS, THE AMERICAN LAW OF TORTS § 29:37 (1991)). Similarly, in *Yeagle v. Collegiate Times,* 255 Va. 293, 497 S.E.2d 136 (1998), the court said: "While 'every fair inference' in a pleading may be used to deter-

mine whether the words complained of are capable of a meaning ascribed by innuendo, inferences cannot extend the statements, by innuendo, beyond what would be the ordinary and common acceptance of the statement." *Id.* at 138 (citing *Carwile v. Richmond Newspapers,* 196 Va. 1, 82 S.E.2d 588, 592 (1954)). Applying the "ordinary and common acceptance of the statement" concept to an article which included the words "Director of Butt Licking" under the name of a college official, and considering the appellation in the context of the whole article, the Supreme Court of Virginia concluded that the words were not capable of defamatory meaning. *Id.;* see also *Chapin v. Knight–Ridder, Inc.,* 993 F.2d 1087 (4th Cir.1993) (affirming trial court's order granting dismissal of plaintiff's defamation action, relating to article stating that a "charity is charging hefty mark-ups on goods," *Id.* at 1093, sent to soldiers stationed in Saudi Arabia, after reference to "the plain and natural meaning of 'mark-up,' " *Id.* at 1093 n. 7.). Following consideration of "the fair and natural meaning which [would] be given [to a letter] by reasonable persons of ordinary intelligence and examin[ation of] the publication as a whole and in context," the Third Circuit concluded that a letter sent to airline passengers and referring to a ticket sold to a passenger by a travel agency as "reported ... stolen" was capable of defamatory meaning because it "emphasize[d] to the reader that some type of criminal misappropriation is involved." *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.,* 164 F.3d 186, 189–90 (3d Cir.1998) (internal quotation marks and citation omitted).

With the foregoing cases in mind, we turn now to an analysis of The Washington Post article. The plain or fair and natural meaning of the words used by Mr. Segal in the article of October 25, 1999, would lead the average or common mind to conclude

that the focus of the article, located in the business section of the newspaper and entitled "Guess Who's on the Line," was Mr. Klayman's efforts to appear frequently on television talk shows, and the reason for his frequent appearances. Thus, the lead sentence of the article asked unambiguously: "Ever wonder how Larry Klayman ends up on so many television talk shows?"

After posing the introductory question, the article proceeded to state the reason for Mr. Klayman's frequent appearance on television talk shows—his free flowing political opinions and his leadership of a non-profit organization that had filed multiple legal suits against the former Clinton presidential administration.[8] The article further explained the reason for Mr. Klayman's popularity with respect to television talk shows—the possibility that he will appear with videotapes of depositions taken in his office, thus providing producers with sufficient material for the show.[9] Yet another reason for Mr. Klayman's frequent appearance on television talk shows, according to the article, was his insistence, (or as the article put it, his mastery of "old-fashioned badgering") that his public relations people "call a handful of talk show producers every single day, rain or shine, regardless of the day's news."

To emphasize Mr. Klayman's persistent efforts to get on television talk shows, the next paragraph of the article posed questions and responses which were attributed to him by a "onetime employee." The questions and responses revealed that regardless of the tragic news of the day, Mr. Klayman demanded that his public relations people call the talk show producers and even sometimes suggested the approach to be taken with them. This paragraph of the article included the material in the last two sentences that Mr. Klayman asserts is capable of defamatory meaning:

> "He would come in each morning and ask, 'Who have you called and why haven't you called?' " said the one[-]time employee, who requested anonymity. "If the show was doing Hollywood that night, he'd say call anyway. If they were doing Tiananmen Square he'd say, 'Well, I'm an international lawyer, try to pitch that.' *If there were a school shooting, he'd say, 'So what? We're doing important things here.' "*

(Emphasis added).

Finally, the last paragraph of the article revealed how one might be exposed to Mr. Klayman's Judicial Watch organization without waiting for his next television appearance. Readers were told that they could access Judicial Watch's web site and view the merchandise for sale, which included a "JW" [Judicial Watch] shirt, a JW windbreaker, and JW watches.

This detailed review of the whole article, and the challenged material, in context, demonstrates that the article's message centered on Mr. Klayman's drive for publicity, and that the article may not reasonably be read to accuse him of insensitivity to tragic events of the day, including the murder of innocent children. Indeed, we cannot say that the average or common mind would naturally understand the article as ascribing to Mr. Klayman insensitivity to the murder of children. To be sure, the sentences with which Mr. Klayman

---

8. The article stated: "No question, he's a spigot of political opinions, and as chairman of Judicial Watch—a nonprofit that has sued the Clinton administration more than a dozen times—he knows how to fulminate about the commander in chief."

9. As the article put it: "Sometimes Klayman even brings his own videotape, lifted from recent depositions in his office. To producers, he's like a dinner guest who brings the meal, then cooks it."

takes issue, "If there were a school shooting he'd say, 'So what? We're doing important things here,' " could perhaps be viewed as unpleasant and offensive from Mr. Klayman's perspective, but such perceived unpleasantness and offensiveness are not sufficient to sustain an allegation that material is reasonably capable of defamatory meaning. *See Best, supra,* 484 A.2d at 989. Indeed, the descriptions of Mr. Klayman's media efforts are not as unflattering as those which described the appellant in *Weyrich, supra,* making him appear to be "highly volatile, irrational [and] unsound." Nor does The Washington Post article use any known reference, as in *MacElree, supra* (reference to "the David Duke of Chester County"), likely to suggest an insensitivity, in this case, to the murder of children. If the challenged sentences make Mr. Klayman appear "odious, infamous or ridiculous," however, they are reasonably capable of a defamatory meaning. *Id.* (citation omitted).

Whether the challenged sentences of the article make Mr. Klayman appear "odious, infamous or ridiculous" is arguably a fairly close call. The average or common mind would naturally understand "odious" to mean "arousing or deserving hatred or loathing"; "infamous" as "notorious" or "in disgrace or dishonor"; and "ridiculous" as "absurd" or "deserving ridicule," that is, "the act of making someone or something the object of scornful laughter by joking, mocking, etc." WEBSTER'S NEW WORLD DICTIONARY, 720, 986, 1224 (2nd coll. ed.1982). However, a close contextual reading of the article, as in *Foley, supra,* reveals nothing that would invoke hatred or loathing for Mr. Klayman, or that would hold him in disgrace or dishonor, or that would subject him to scornful laughter. In the critical paragraph of the article, three examples are given of Mr. Klayman's alleged approach to his public relations people. The first indicated that if the subject of a television talk show was Hollywood, Mr. Klayman instructed his employee to "call anyway." The second related to a tragedy as did the third illustration. If the television talk show's theme was Tiananmen Square, Mr. Klayman told his employee to "pitch" the fact that he is an international lawyer. The third illustration was the one at issue in this case, a school shooting such as that at Columbine. Consistent with the first two approaches, Mr. Klayman's alleged response was to urge his employee to understand the importance of Judicial Watch's work and to continue to try to schedule his appearance on a television talk show.

■ While, at first blush, these alleged responses might be considered harsh if uttered by a person who heads a "pro-life ethics organization," and might even be perceived as likely to have an impact on his standing in the community, nonetheless, our task is to apply the common definitions of the operative words, "odious, infamous, or ridiculous," and to consider the article as a whole. In doing so, we are constrained to hold that, when read in context, a reasonable person of ordinary intelligence would not understand the fair and natural meaning of the statement in question to be that Mr. Klayman is insensitive to the murder of innocent children. Therefore, we conclude that these words are not reasonably capable of defamatory meaning as a matter of law since they do not make Mr. Klayman appear "odious, infamous and ridiculous." Rather, when read in context, a reasonable person of ordinary intelligence would understand the words to convey the message that a school shooting tragedy should not interfere with an employee's scheduling of television talk show appearances to enable Judicial Watch to explain its public interest endeavors, even if scheduling appearances required pitching the public relations strategy to a

major event of the day, such as the Tiananmen Square event.

 We now turn to Mr. Klayman's false light invasion of privacy claim. We are required to determine whether as a matter of law the statement, "If there was a school shooting, he'd say, 'So what? We're doing important things here,' " placed Mr. Klayman "in a 'highly offensive false light,' " *Weyrich, supra,* 344 U.S.App. D.C. at 256, 235 F.3d at 628, in the eyes of "a reasonable person," *Kitt, supra,* 742 A.2d at 859. Mr. Klayman maintains that a polygraph [10] shows the statement in question to be false, and hence, it portrays him in an offensive false light. As the head of a "pro-life ethics organization," he is now perceived as putting personal gain and public exposure above the lives of innocent children. But, " '[A] plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion.' " *Moldea II, supra,* 306 U.S.App.D.C. at 10, 22 F.3d at 319 (quoting *Moldea I,* 304 U.S.App.D.C. at 420, 15 F.3d at 1151). Consequently, similar to our conclusion that the challenged statement did not make Mr. Klayman appear to be "odious, infamous or ridiculous," and for the same reasons, we are constrained to agree with the trial court that the statement did not place Mr. Klayman in "a 'highly offensive' false light." *Weyrich, supra,* 344 U.S.App. D.C. at 256, 235 F.3d at 628.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

---

10. Mr. Klayman attached to his complaint a report of a polygraph examination which allegedly showed that the quotation attributed to him was false. "It is well settled that the results of lie detector tests are inadmissable in this jurisdiction." *Peyton v. United States,* 709 A.2d 65, 69 (D.C.1998) (quoting *Contee v. United States,* 667 A.2d 103, 104 n. 4 (D.C. 1995) (per curiam)); (citing, *inter alia, Frye v. United States,* 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923)).