**Patrick M. CLAWSON, Appellant,**

v.

**ST. LOUIS POST–DISPATCH, L.L.C., et al., Appellees.**

**No. 04–CV–486.**

District of Columbia Court of Appeals.

Argued May 18, 2005.

Decided Aug. 31, 2006.

William P. Farley, Washington, D.C., for appellant.

Joseph E. Martineau with whom Kurt A. Wimmer and Brent F. Powell, were on the brief, for appellees.

Before REID, Associate Judge, and NEBEKER and TERRY,[*] Senior Judges.

REID, Associate Judge:

Appellant Patrick M. Clawson appeals from the judgment of the trial court dismissing his complaint alleging defamation and other torts against appellees. He essentially argues that the trial court erred as a matter of law in dismissing his complaint because the words "informer" and "FBI informer," as used in a newspaper article, were defamatory as a matter of law, or reasonably capable of defamatory meaning. We affirm the judgment of the trial court and hold that the terms "informer" and "FBI informer" are not defamatory as a matter of law; nor are they reasonably capable of a defamatory meaning.

## FACTUAL SUMMARY

On September 26, 2005, Mr. Clawson, "a broadcaster, investigative reporter and licensed private investigator," filed a lawsuit against the St. Louis Post–Dispatch, LLC, three of its employees, and Pulitzer, Inc., the publisher of the St. Louis Post–Dispatch. Mr. Clawson's complaint contained five counts: (1) libel per se, (2) libel, (3) false light/invasion of privacy, (4) intentional infliction of emotional distress, and (5) disparagement—injurious falsehood. He sought "compensatory damages in excess of $1,000,000 and punitive damages to be determined at trial."

The lawsuit grew out of Mr. Clawson's September 2002 interview by Karen Branch–Brioso, a reporter for the St. Louis Post–Dispatch who was stationed in the newspaper's Washington, D.C. Bureau. Ms. Branch–Brioso had been focusing on Dr. Steven Jay Hatfill, a "person of interest" in the well-publicized 2001 anthrax investigation. The results of Ms. Branch–Brioso's interview with Mr. Clawson appeared in an article in the September 30, 2002 edition of the paper. A copy of the article was attached to the complaint. The first paragraph of the article referred to Dr. Hatfill's "denunciation of the FBI focus on him in the anthrax investigation." The first sentence of the next paragraph described Mr. Clawson as a "1970s-era St. Louis journalist turned private eye turned FBI informer." The next part of the article described the impact of the anthrax investigation on Dr. Hatfill. The last part of the article focused on Mr. Clawson and an incident in which he had tipped the FBI concerning wrongdoing at a private investigative firm for which he worked. Although he was arrested as part of the FBI's investigation of the firm, the grand jury did not indict him, and the article

---

[*] Judge Terry was an Associate Judge of the court at the time the case was argued. His status changed to Senior Judge on February 1, 2006.

referenced Mr. Clawson's belief that he "deemed [the charges against him] as payback for 'blowing the whistle on corrupt cops.'"

Mr. Clawson alleged that the article "injured [him] and destroyed his reputation as a broadcaster, an investigative reporter, and private investigator," because it contained false and defamatory information. Specifically, he claimed that the reference to him as an "informer" rather than as a "whistle-blower" injured and destroyed his reputation. He maintained that the word "whistle-blower" has a positive connotation because "[w]histle-blowers are courageous law abiding citizens [who] expose corruption, usually corruption arising at their job." In contrast, ["i]nformers are generally feared and disdained," "act ... in their own self-interest, providing information for compensation or personal reward." He further alleged that "informers are usually criminals who provide information for cash or to obtain favors from Government officials, such as leniency in sentencing." He asserted that after information in the article was picked up and printed in other publications, he "received dozens of calls from journalists covering [Dr.] Hatfill's case demanding to know how long he had been an FBI informer and if he had been informing on Dr. Hatfill." He interpreted these calls as questions about his ability "to assure his sources that the information he receives is kept in confidence and will not be passed on to the government." Such assurances are essential, he said, because of his work with law firms which require confidentiality. He asserted that his "reputation was harmed because many people believed, or asked, if he was informing on [D]r. Hatfill."

On December 8, 2003, the defendants filed a joint motion to dismiss the complaint, citing Super. Ct. Civ. R. 12(b)(6), and arguing that the word "'informer' in

the context used" (1) "is not reasonably capable of a defamatory meaning and would not be understood in a defamatory fashion by persons of ordinary intelligence," (2) "is a protected statement of opinion based on disclosed facts accurately stated"; and (3) "is substantially true as a matter of law." Defendants also submitted a legal memorandum in support of their motion. In addition, they included a forty-one page appendix consisting of various newspaper articles to show that the terms whistleblower and informer "mean the same thing and are used interchangeably." Moreover, they contended, "'informer' may refer to 'law-abiding citizens [who] expose corruption, usually corruption arising at their jobs' and who 'act in the public interest, often against their own self-interest.'"

In opposing the defendants' motion to dismiss, Mr. Clawson filed a memorandum of law defending the sufficiency of his complaint and noting that the District is a notice pleading jurisdiction. He sought to demonstrate how each of the counts in his complaint would survive a motion to dismiss. Defendants' reply reiterated Mr. Clawson's failure to state a claim as a matter of law, even when considered in the light most favorable to him.

On April 21, 2004, the trial court issued a twenty-page order and memorandum treating defendants' motion to dismiss as a motion for summary judgment "[b]ecause the Court considered materials outside of the pleadings, namely the St–Louis Post–Dispatch article in question...." On the same day, the trial court granted defendants' motion. The court's memorandum consisted of an analysis of each count in Mr. Clawson's complaint, supported by case law. Mr. Clawson filed a timely notice of appeal.

## ANALYSIS

 Mr. Clawson first contends that the trial court erred in treating the defendants' motion as one for summary judgment without first giving him "a reasonable opportunity to present material evidence." He maintains that had the trial court applied the proper standard, that is the Super. Ct. Civ. R. 12(b)(6) standard which "requires the trial court to construe the complaint 'in the light most favorable to the plaintiff,'" his complaint would not have been dismissed. In *Kitt v. Pathmakers, Inc.*, 672 A.2d 76, 79 (D.C.1996), we said: "Before a Rule 12(b)(6) motion may be [treated as one for summary judgment] ..., the express language of the Rule requires that 'all parties be given a reasonable opportunity to present material relevant to the [summary judgment] motion before it is decided.'" *Id.* at 79 (citing *Vincent v. Anderson*, 621 A.2d 367, 372–73 (D.C.1993)) (other citation omitted). Here, the trial court inadvertently overlooked the fact that the St. Louis Post–Dispatch article, which it said was material outside the complaint, actually was attached to the complaint as "Exhibit A." Therefore, there was no need for the trial court to treat defendants' motion as one for summary judgment because the only document it considered, other than the complaint, was the attached newspaper article. Moreover, as presented by Mr. Clawson, the court was faced with a legal issue concerning the word "informer" as used in the context of the newspaper article. Consequently, the trial court's inadvertent mistake is of no moment since Mr. Clawson suffered no prejudice. Whether the trial court considered the legal issue raised by his case in the setting of a defense motion to dismiss, or a defense motion for summary judgment, the outcome would have been the same—defendants/appellees would be entitled to judgment as a matter of law. To demonstrate that the outcome would have been the same, we next set forth and then apply applicable legal standards and principles.

 We review both a Rule 12(b)(6) motion and a motion for summary judgment *de novo*. *See Klayman v. Segal,* 783 A.2d 607, 612 (D.C.2001) (citing *Wallace v. Skadden, Arps, Slate, Meagher & Flom L.L.P.,* 715 A.2d 873, 877 (D.C.1998)); *Wallace v. Skadden, Arps, Slate, Meagher & Flom L.L.P.,* 799 A.2d 381, 385 (D.C. 2002). "We dismiss a complaint for failure to state a claim for which relief can be granted only if 'it is beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief.'" *Klayman, supra,* 783 A.2d at 612 (citing *Wallace, supra,* 715 A.2d at 877 (other citations omitted)). "The allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiff and, if these allegations are sufficient, the case must not be dismissed even if the court doubts that the plaintiff will ultimately prevail.'" *Id.* (citing *Atkins v. Indus. Telecomm. Ass'n, Inc.,* 660 A.2d 885, 887 (D.C.1995)). To prevail on a summary judgment motion, "the movant [ ] must demonstrate that there is no genuine issue of material fact, and that [the movant] is entitled to judgment as a matter of law." *Isaac v. First Nat'l Bank of Maryland, D.C.,* 647 A.2d 1159, 1160 (D.C.1994). "[T]he material lodged in support of the motion must be viewed in the light most favorable to the opposing party." *Nader v. deToledano,* 408 A.2d 31, 42 (D.C.1979) (citations omitted).

 "A plaintiff bringing a defamation action ... must show: (1) that the defendant[s] made a false and defamatory

statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Beeton v. District of Columbia,* 779 A.2d 918, 923 (D.C. 2001) (citations and quotation marks omitted). "We will not dismiss a complaint under Rule 12(b)(6) which alleges defamation if 'the communications of which the plaintiff complains were reasonably susceptible of a defamatory meaning.'" *Klayman, supra,* 783 A.2d at 612–13 (footnote omitted). "Whether a statement is capable of defamatory meaning is a question of law, but it is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *Weyrich v. New Republic, Inc.,* 344 U.S.App.D.C. 245, 255, 235 F.3d 617, 627 (D.C.Cir.2001) (citations and internal quotation marks omitted).

 "A statement is 'defamatory' if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Moss v. Stockard,* 580 A.2d 1011, 1023 (D.C.1990) (citations omitted). However, "an allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'" *Howard Univ. v. Best,* 484 A.2d 958, 989 (D.C.1984) (citation omitted); *see also Guilford Transp. Indus., Inc. v. Wilner,* 760 A.2d 580, 594 (D.C.2000). "The plaintiff has the burden of proving the defamatory nature of the publication, and the publication must be considered as a whole, in the sense in which it would be understood by the readers to whom it is addressed." *Best, supra,* 484 A.2d at 989 (citations omitted). "[A] statement ... may not be isolated and then pronounced defamatory, or deemed capable of defamatory meaning. Rather, any single statement or statements must be examined within the context of the entire [article]." *Heard v. Johnson,* 810 A.2d 871, 886 (D.C. 2002) (citing *Klayman, supra,* 783 A.2d at 614 (internal quotation marks omitted)).

 We turn now to the application of these legal principles to Mr. Clawson's argument that the trial court erred as a matter of law in concluding that the term "'informer' on its face does not have a defamatory meaning." He claims that an "'informer' engages in illegal behavior while a 'whistle blower' refuses," and that "informers have a negative public image while whistle blowers are seen as champions of the public interest." He maintains that "[t]he defendants' accusations that [Mr.] Clawson was an 'informer' and 'FBI informer' destroyed [his] livelihood, wrecked his standing in his community, and seriously impaired his sense of dignity and self esteem." Appellees contend that "the term 'informer' must be assessed in light of the context of the [a]rticle as a whole, and in this light it simply cannot convey the allegedly defamatory connotations asserted by [Mr.] Clawson as a matter of law." They also assert that "even if it were permissible to analyze the single word 'informer' in isolation, courts regularly have rejected identical libel claims as a matter of law on the grounds that there is nothing defamatory about being called an 'informer.'"

In *Heard* and *Klayman, supra,* we stressed the importance of context to an analysis concerning whether a statement is reasonably capable of any defamatory meaning: "[A] statement ... may not be isolated and then pronounced defamatory,

or deemed capable of defamatory meaning. Rather, any single statement or statements must be examined within the context of the entire [article]." *Heard, supra,* 810 A.2d at 886 (citing *Klayman,* 783 A.2d at 614). Consequently, we begin our legal analysis with the context of the St. Louis Post–Dispatch article.

The article bears a headline reading: "Hatfill turns to an old pro to get his message out." The subtitle of the article states: "Radio executive has history of dealing with FBI—as an informer." The lead paragraph of the article refers to Dr. Hatfill as a "former Army bioscientist," and mentions his "denunciation of the FBI's focus on him in the anthrax investigation." The second paragraph introduces Mr. Clawson as a "1970s-era St. Louis journalist turned private eye turned FBI informer," who is currently "a Washington radio executive moonlighting as [Dr.] Hatfill's volunteer spokesman." The third paragraph begins with a quote attributed to Mr. Clawson and made during a "nationally televised news conference": Mr. Clawson, portrayed as a man with "a booming broadcast voice," said: "Dr. Hatfill has been living a life of utter hell." The third paragraph also highlights Mr. Clawson's dual roles as "sales and marketing chief at a national radio network" and as media advisor to Dr. Hatfill. In the fourth paragraph, Mr. Clawson explains his reasons for holding press conferences in behalf of Dr. Hatfill: "Steve was being made out to be a monster in the press— like a wacko Unabomber," and "needed to get his story out before the press." The fifth paragraph embodies more quotations from Mr. Clawson, with an introductory sentence indicating that "[h]e doesn't mince words in defending his friend [Dr. Hatfill]." One of the quotes attributed to him is: "When you've got the FBI and [then Attorney General] Ashcroft crawling up your rectum like they are, they're likely to find something."

In the sixth paragraph Ms. Branch–Brioso provides more background information on Mr. Clawson—from his 1974 radio job, to his positions as an investigative television reporter during the remaining decade of the 1970s, to his investigative work with a private firm, beginning in 1980. The seventh paragraph focuses on an FBI "raid[ ]" of the private firm's office after the FBI was "tipped off by [Mr.] Clawson" that "the Clayton agency" (probably a reference to the firm) "had paid local police to tap into a national crime database and provide the office with confidential arrest records." As a result of the FBI's work, the Clayton agency and some police officers in the St. Louis, Clayton and Florissant police departments were fined, and some officers resigned. The seventh paragraph of the article summarizes the impact of the FBI's raid on Mr. Clawson. He was arrested and charged with "ask[ing] the agency for $5,000 in return for not providing information to help prove the charges against it." However, "[a] St. Louis County grand jury refused to indict him on the charges, deemed by [Mr.] Clawson as payback for 'blowing the whistle on corrupt cops.'" The eighth paragraph points out that "the man who once gave a hand to the FBI has become its most public critic in the case of his friend [Dr.] Hatfill." The article ends with a quote from Mr. Clawson: "You really have a case here of the government run amok."

Read in context the words "informer" and "FBI informer" are not "reasonably susceptible of a defamatory meaning," *Klayman, supra,* 783 A.2d at 612–13 (quoting *Wallace, supra,* 715 A.2d at 875). The central theme of the article is Dr. Hatfill's decision to enlist help from a professional journalist and private investigator in his effort to address the media's depiction of

him as the focus of the FBI's anthrax investigation. The article portrays Mr. Clawson as Dr. Hatfill's friend, and as a journalist who also became a private investigator, and who, in that capacity, gave a tip to the FBI about wrongdoing by both his private investigative firm and police officers. The tip resulted in fines and resignations for those who participated in the wrongdoing. While Mr. Clawson initially was implicated in the wrongdoing, the article makes clear that the grand jury refused to indict him, a fact which Mr. Clawson attributed to his "blowing the whistle on corrupt cops." Towards the end of the article Mr. Clawson is characterized favorably as a man who helped the FBI, but also as a person who publicly criticized the FBI because of that agency's intense focus on his friend, Dr. Hatfill, during its anthrax investigation.

Not only does the contextual examination of the article negate the existence of any defamatory content which could injure Mr. Clawson in his reputation, such as a direct or indirect reference to him as a felon or a criminal, but, contrary to his argument, courts, as a matter of law, have not found the word "informer" to be either defamatory or reasonably capable of defamatory meaning. *Agnant v. Shakur*, 30 F.Supp.2d 420, 421 (S.D.N.Y.1998), involved a libel suit by "an alleged informant" against the rapper, Tupac Shakur, his Estate, and others. The plaintiff alleged that he had been defamed in a song written by Mr. Shakur which intimated that he " 'was working as an undercover federal informant' " in connection with the rapper's 1993 arrest and 1994 conviction. *Id.* at 422. The court granted the defendants' motions for summary judgment, concluding that, "[i]nsofar as plaintiff alleges libel based on the accusation that he served as an informant, the complaint must be dismissed." *Id.* at 425. After examining case law which addressed the

issue, "whether falsely accusing one of acting as an informant can be defamatory," *id.* at 424, the trial judge declared: "So far as I can tell, every other court to have considered the question, save one, has held, as a matter of law, that such a statement cannot be defamatory, the sole exception being the Scottish court in the nineteenth-century case of *Graham v. Ray*, 13 Sess. Cas. 634, 636 (1851)," *id.* Similar to the case before us, in *Andrews v. Stallings*, 119 N.M. 478, 892 P.2d 611, 611 (N.M.Ct.App.1995), the plaintiffs filed suit claiming, in part, defamation, intentional infliction of emotional distress, and invasion of privacy. The court affirmed the dismissal of the complaint and said:

> We cannot ... consider it "atrocious" that [one of the defendants] contacted the IRS to report his suspicions regarding Plaintiffs' income tax filings. Whatever [his] motivations, the law encourages citizens to report any suspected violation of the tax laws to the IRS. Furthermore, we have not reached the point where a lawful attempt to assist law enforcement agents is considered odious.

*Id.* at 624 (citations omitted).

In another case, after a book was published, the plaintiff brought a law suit against the publisher, "alleg[ing] that the book libels him by describing him as a informant." *Waring v. William Morrow & Co.*, 821 F.Supp. 1188, 1189 (S.D.Tex. 1993). Following its contextual review of the alleged defamatory passage in the book, the District Court asserted:

> [T]he Court has read in full the passages relating to Plaintiff and finds that they are unambiguously non-defamatory. Plaintiff is portrayed in the book as a private investigator who comes into possession of information regarding a planned homicide and reports the infor-

mation promptly to a friend with the police department so that steps can be taken to prevent the woman's death, all with the knowledge that these actions could place his own life in danger. This is not capable of a defamatory meaning; indeed, it is highly laudatory ... Plaintiff cannot avoid summary judgment ... by taking statements out of context in an attempt to argue that they are capable of libelous meaning.

*Id.* at 1189–90 (citation omitted). While acknowledging that no Maryland law addressed whether calling someone a criminal informant is defamatory, a federal District Court stated in yet another case, "it is evident to this Court, as a matter of law, that a communication is not libelous if it merely accuses one of being a criminal informant." *Burrascano v. United States Att'y Gen. Levi,* 452 F.Supp. 1066, 1072 (D.Md.1978). In a case concerning whether reference to someone as "an alleged F.B.I. informant" is defamatory, the court opined: "A statement that a person is an informant of a law enforcement agency does not label one with unlawful or improper conduct. 'Our society has not ... reached a point where false rumors of a lawful attempt to assist law enforcement agents constitute slander *per se.*'" *Saunders v. Board of Directors, WHYY–TV (Channel 12),* 382 A.2d 257, 259 (Del.Super.Ct.1978) (citing *Danias v. Fakis,* 261 A.2d 529, 531 (Del.Super.Ct.1969)). A New York trial court considered plaintiff's allegation that the following statement was defamatory: Plaintiff "was informing the proper Interstate Commerce Commission officials of the names of various truckers and truck drivers who were violating the Interstate Commerce Commission rules and regulations in regard to the number of hours that they worked continuously without rest." *Connelly v. McKay,* 176 Misc. 685, 28 N.Y.S.2d 327, 328 (N.Y.Sup.Ct. 1941). The court concluded that the state-

ment was not defamatory and declared: "To hold otherwise would be contrary to the public interest, in that it would penalize the law abiding citizen and give comfort to the law violator." *Id.* at 329. We see no reason to deviate from the reasoning of the aforementioned cases.

■ Mr. Clawson's argument that there is a clear distinction between "an informer" and "a whistle-blower"—that an "informer' engages in illegal behavior while a 'whistle-blower' refuses," and that "informers have a negative public image while whistle blowers are seen as champions of the public interest"—is simply not persuasive. BLACK'S LAW DICTIONARY defines the terms "informer", "citizen informant" and "whistle blower" as follows:

Informer: An undisclosed person who confidentially discloses material information of a law violation, thereby supplying a lead to officers for their investigation of a crime. This does not include persons who supply information only after being interviewed by police officers, or who give information as witnesses during the course of investigation.

BLACK'S LAW DICTIONARY 790 (6th ed.1990) (citations omitted).

Citizen informant: An eyewitness who, with no motive but public service and without expectation of payment, identifies himself or herself and volunteers information to the police.

*Id.* at 244 (citation omitted).

Whistle blower: An employee who refuses to engage in and/or reports illegal or wrongful activities of his employer or fellow employees....

*Id.* at 1596 (citations omitted). Under these definitions, an informer, a citizen informant, and a whistle blower all act for the public good by assisting law enforcement authorities. Nothing in these definitions remotely suggests that an informer

or a citizen informant is perceived as "odious, infamous and ridiculous." *Klayman, supra,* 783 A.2d at 618; *Best, supra,* 484 A.2d at 989. Nor does the St. Louis Post–Dispatch article upon which Mr. Clawson's complaint is based, "tend[ ] so to harm the reputation of [Mr. Clawson] as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." RESTATEMENT (SECOND) OF TORTS § 559 (1977); *see also Moss, supra,* 580 A.2d at 1023. In short, since the underlying assumption of the counts in Mr. Clawson's complaint is that reference to someone as an "informer" or an "FBI informer" is defamatory, and we have determined, as a matter of law, that these words are not defamatory, the trial court did not err in dismissing all of the counts of Mr. Clawson's complaint. *See Beeton,* 779 A.2d at 923 (defamation); *Kitt v. Capital Concerts, Inc.,* 742 A.2d 856, 859 (D.C. 1999) (false light/invasion of privacy/intentional infliction of emotional distress); *Andrews,* 892 P.2d at 624 (libel *per se;* libel); *Agnant, supra,* 30 F.Supp.2d at 424 (libel *per se,* libel); *Homan v. Goyal,* 711 A.2d 812, 818 (D.C.1998)(intentional infliction of emotional distress); *Art Metal–U.S.A., Inc. v. United States,* 244 U.S.App. D.C. 1, 5–6, 753 F.2d 1151, 1155–56 (1985)(disparagement/injurious falsehood).

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*