SOLERS, INC., Appellant,

v.

**John DOE.**

**Software & Information Industry Association, Appellee.**

No. 07–CV–159.

District of Columbia Court of Appeals.

Argued June 19, 2008.

Decided Aug. 13, 2009.

942

Daniel J. Tobin for appellant.

Charles D. Tobin, Washington, with whom Leo G. Rydzewski was on the brief, for appellee Software & Information Industry Association.

Robert A. Long, Jr., Martin F. Hansen, and Mark W. Mosier, Washington, filed a brief amicus curiae for the Business Software Alliance in support of appellee.

Before REID, GLICKMAN, and FISHER, Associate Judges.

FISHER, Associate Judge:

In this unusual case, the defendant has not yet been identified. Appellant Solers, Inc. filed a complaint against John Doe, alleging defamation and tortious interference with "prospective advantageous business opportunities." Seeking to learn the identity of John Doe so that it could proceed with service of process, Solers next served a subpoena upon appellee, the Software & Information Industry Association ("SIIA"). In response, SIIA filed a motion to quash the subpoena. The trial court granted that motion and later dismissed Solers' lawsuit for failure to state a claim. Concluding that both rulings were made in error, we vacate the trial court's orders and remand for further proceedings consistent with this opinion.

## I. Factual Background

Appellant Solers, Inc. "is a for-profit Virginia corporation with its principal place of business in Arlington, Virginia. [Its] work principally consists of developing software and other technology for agencies within the Department of Defense." Solers is a privately held company, owned by its employees. Appellee SIIA describes itself as "the principal trade association for the software and digital content industry" and explains that "[o]ne of [its] chief missions is to protect the intellectual property of member companies by fighting the software piracy that threatens to undermine the entire industry." While Solers' work is primarily in the same industry that SIIA seeks to protect, Solers is not a member of SIIA.

In order "[t]o fulfill its mission, SIIA [has] established an Anti–Piracy Division

and developed anti-piracy programs involving both education and enforcement." "SIIA's enforcement program enables sources with knowledge of software piracy to report anonymously to SIIA via telephone or the Internet about companies [committing piracy]. . . ." To encourage reporting, "SIIA allows individuals to submit information . . . on a confidential basis." Through this program, John Doe, an "individual," reported that Solers was engaged in illegal activity. Accusations of copyright infringement followed, and Solers sued Doe but has not been able to learn his or her identity.[1]

## A. SIIA's Accusation of Copyright Infringement

SIIA acknowledges that, "[i]n March 2005, [it] received a communication via the Internet from [Doe] who alleged that Solers was using unlicensed software." Soon thereafter, on April 29, 2005, SIIA's attorney wrote to the President of Solers, accusing Solers of "copyright infringement." The letter stated that SIIA "has evidence that Solers, Inc. is engaged in the unlawful copying and use of software published by the software publishers listed in [the attached exhibit] in violation of the Copyright Act, Title 17 U.S.C. § 501, et seq." The letter announced that "[SIIA is] prepared to seek remedies available under the Copyright Act," but explained that SIIA "prefer[s] to work with companies to reach a resolution that is quick, fair and out of the public spotlight . . . [through] a three part process [that leads to] an easy and quick settlement. . . ."

SIIA's letter demanded that Solers complete an internal audit of its software programs, instructed Solers on how to complete the audit, and requested that Solers deliver the results to SIIA. According to SIIA's letter, once the audit was complet-

ed, the parties would negotiate a settlement and SIIA would release Solers "from all claims and causes of action for copyright infringement." The letter warned, however, that "if Solers [ ] is unwilling to *promptly* conduct an audit and the other activities mentioned [in the letter], [Solers] should be aware that SIIA will not hesitate to initiate litigation against Solers [ ] for copyright infringement." The letter did not provide any information about the alleged "evidence" of Solers' "copyright infringement," or any details regarding the source of this "evidence."

According to Solers, "[b]etween May 2 and May 13, 2005, representatives of SIIA and Solers communicated regarding [SIIA's] allegations of software piracy by Solers. Through these communications, Solers informed SIIA that it had reviewed its computer systems and confirmed that Solers had violated no party's copyright." Solers further asserts that "[a]s a result of the communications between Solers and SIIA between May 2 and May 13, Solers satisfied SIIA that [Doe's] allegations were false. On Friday, May 13, 2005, counsel for SIIA confirmed to [Solers' attorney] that SIIA had 'closed its file' on Solers." (SIIA states that it decided not to pursue a claim against Solers in order to protect the identity of John Doe, not because it concluded that his allegations were false.)

## B. The Identity of John Doe

John Doe used the "website reporting form" that is part of SIIA's "Corporate Anti–Piracy program" to provide information about Solers. Sources, like Doe, "who report piracy by corporate software end-users to SIIA[,] may become eligible for financial payment under [this program.]" Source reports "are received by two SIIA employees who . . . forward [them] to [the

---

1. The record does not indicate Doe's gender, but, consistently with the caption of this appeal, we will use masculine terms to refer to the defendant-in-waiting.

program's legal counsel] for [ ] review" and a determination as to whether SIIA should "pursue the report further."

SIIA asserts that it has kept Doe's identity and the information that Doe provided about Solers confidential. SIIA has a "long standing policy of keeping the identity of [its] sources anonymous (unless required by law to disclose the identity)[, and] . . . maintain[ing] as confidential the information provided by its sources[.]" Thus, when Solers asked SIIA to voluntarily disclose Doe's identity in May 2005, SIIA refused to do so. The only information SIIA has disclosed is that Doe is an "individual" who "does not work or reside in the District of Columbia" and "did not choose to participate in SIIA's Reward Program and therefore was never asked to, and did not sign, the Terms and Conditions of the Corporate Anti–Piracy Report Program."

## II. Procedural History

On May 18, 2005, Solers filed a complaint against Doe which alleged one count of defamation and one count of tortious interference with "prospective advantageous business opportunities[,]" and requested injunctive relief, compensatory damages, and punitive damages. The following day Solers issued a subpoena to SIIA, seeking production of all documents related to the identity of Doe, Doe's initial report and his ensuing correspondence with SIIA, and "[a]ll documents . . . believed to be 'evidence' " of Solers' alleged copyright infringement. SIIA, which is not a party to the underlying suit, lodged

objections to the subpoena on June 9, 2005, and, in response, Solers immediately moved to enforce the subpoena. SIIA then filed a motion to quash.

On December 16, 2005, Judge Blackburne–Rigsby heard arguments from Solers and SIIA on these two motions. Counsel for SIIA informed us at oral argument that SIIA notified John Doe of the lawsuit and the subpoena. However, Doe did not participate in this hearing, either in person or through counsel, and only SIIA made arguments in support of Doe's interests.

Solers argued that "where a plaintiff comes to court and accuses [a] defendant of illegal conduct, [the defendant] can't hide behind the First Amendment . . . to remain anonymous." Solers conceded that some anonymous speech on "public affairs" is protected, but it argued that such protection is not appropriate here because "[t]his was a private e-mail from Doe to a private organization accusing [Solers] of fundamentally improper conduct in the industry in which it operates." SIIA, on the other hand, argued that the "anonymous speaker" on the internet has First Amendment rights and that a plaintiff must "do more than file a lawsuit" in order to unmask him. Acknowledging that it was raising novel issues in the District of Columbia,[2] SIIA presented case law from other jurisdictions.

At a status hearing on April 28, 2006, the court heard additional argument from Solers.[3] Expressing concern that "there's been no financial or economic harm dem-

---

**2.** After the parties presented oral argument, but before this opinion was released, Judge Bates of the United States District Court considered a similar case where the plaintiff sought to learn the identities of his alleged defamers. *Sinclair v. TubeSockTedD,* 596 F.Supp.2d 128 (D.D.C.2009). Although he discussed the case law from other jurisdictions addressing this issue, Judge Bates ultimately dismissed the plaintiff's complaint for

lack of personal and subject matter jurisdiction and therefore did not need to resolve "the precise standard appropriate for determining whether disclosure of anonymous Internet speakers is warranted." *Id.* at 132.

**3.** Due, apparently, to its non-party status, SIIA did not receive notice of this hearing and did not attend.

onstrated in the pleadings[,]" the court asked Solers to address this issue, explaining that "I get to this question about … harm … [because] one of the test[s] that I should apply in determining whether or not to compel [SIIA] to release [Doe's identity] is whether or not your claim will withstand a motion to dismiss." In response, Solers argued that "the harm is actual," "the harm is reputational," and "when we get into discovery with John Doe we'll find out what other harm has been caused, and that may very well be economic." The court then questioned Solers about the "other efforts [it has] taken to identify John Doe" and Solers explained that it "is not aware of anyone else that John Doe has communicated the defamation to … [and is] not aware of any other way to get this information."

After the status hearing, Solers filed an Amended Complaint and both Solers and SIIA filed supplemental memoranda in support of their respective motions. On August 16, 2006, the trial court issued an order granting SIIA's Motion to Quash the Subpoena. Although the court discussed the various standards used in other jurisdictions for deciding whether to enforce a subpoena seeking the identity of someone who speaks anonymously over the internet, it applied the standard for dismissing a complaint for failure to state a claim. Super. Ct. Civ. R.12 (b)(6). The court concluded that "Solers has not made a claim of relief for its defamation allegation … because it alleges no facts to demonstrate that it has suffered any harm/injury … [and it] must show actual harm." The court further reasoned that "[b]ecause Solers' claim could not withstand a motion to dismiss standard, its need for Doe's identity is not outweighed by SIIA's interest in keeping that identity private." [App. 226] It also concluded that Solers had failed to "exhaust[ ] alternative methods of obtaining Doe's identity" and that it would not enforce a subpoena until Solers has done so. Relying on this analysis, Judge Anderson, who had not previously been involved in the case, later dismissed the suit in its entirety "for failure to state a claim upon which relief can be granted."

### III. Standard of Review

■■ This appeal presents two distinct questions subject to *de novo* review. "Because a motion to dismiss a complaint under Rule 12(b)(6) presents questions of law, our standard of review … is *de novo*." [4] *In re Estate of Curseen*, 890 A.2d 191, 193 (D.C.2006) (internal citations and quotation marks omitted). "We apply the same standard as the trial court, meaning we accept the allegations of the complaint as true, and construe all facts and inferences in favor of the plaintiff." *Id.* (internal citations and quotation marks omitted). "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.* at 194. "[S]ince we take the facts alleged in the complaint as true, … the presentation of evidence to counter a Rule 12(b)(6) motion is not required." *Id.* (internal citations and quotation marks omitted).

■■ "While trial court determinations on motions to quash typically are reviewed for abuse of discretion," this case does not present the typical situation of "quintessentially discretionary judgment calls … [that] turn on fact-specific determinations of unreasonableness and oppressiveness…." *In re Public Defender Service*, 831 A.2d 890, 898 (D.C.2003) (internal citations omitted). Rather, "our analysis in

---

4. This case is unusual because defendant Doe has not been served with the complaint and never filed a motion to dismiss. However, the analysis accompanying the order of dismissal resembled that applied to a Rule 12(b)(6) motion. Accordingly, we will assess the dismissal as if it originated from a motion to dismiss filed by the defendant.

this case must focus not on the motions judge's findings of fact or exercise of discretion, but on the correctness of the judge's legal conclusions—[her] statement of the applicable law and [her articulation of the appropriate standard.]" *Id.* A trial court "would necessarily abuse its discretion if it based its ruling on an erroneous view of the law...." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

## IV. The Order of Dismissal

 On February 12, 2007, the trial court ordered "this action [ ] dismissed for failure to state a claim upon which relief can be granted[.]" *See* Super. Ct. Civ. R. 12(b)(6). To decide whether Solers sufficiently pled its claims for defamation and tortious interference, we look for guidance to Super. Ct. Civ. R. 8(a), which "sets forth the minimum requirements for pleading a claim for relief." *Bolton v. Bernabei & Katz, PLLC*, 954 A.2d 953, 963 (D.C. 2008) (internal citations and quotation marks omitted). "All that is required when we consider the sufficiency of the pleading is a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* The purpose of this statement is to "give the defendant fair notice of what the [pleader's] claim is and the grounds upon which it rests[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). We conclude that the amended complaint sufficiently states claims for defamation and tortious interference under the fairly minimal pleading requirements of Super. Ct. Civ. R. 8(a).[5]

 In order to state a claim of defamation, "plaintiff must allege and prove four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C.2005) (quoting *Crowley v. North Am. Telecomms. Ass'n*, 691 A.2d 1169, 1173 n. 2 (D.C.1997)). Unlike some jurisdictions, which apply a "heightened pleading rule" to claims of defamation, we instead focus our inquiry on whether "the factual allegations in the appellant's complaint are sufficient to permit the opposing party to form responsive pleadings, [since this is] the principal reason that some courts demand a heightened standard of pleading in defamation[ ] cases." *Oparaugo*, 884 A.2d at 76–77 (quoting *Crowley*, 691 A.2d at 1172) (internal editing and quotation marks omitted). As to the claim of tortious interference with prospective advantageous business opportunities, "plaintiff must show that the interference was intentional and that there was resulting damage." *Kreuzer, D.M.D. v. George Washington University*, 896 A.2d 238, 247 (D.C.2006) (discussing the showing necessary to establish "a prima facie case of interference with business relations") (internal citations and quotation

---

5. This appeal does not require us to decide whether this court will follow the "facial plausibility" standard recently discussed in *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). The amended complaint in this case would meet that standard because it pleads ample "factual content that allows the court [accepting the allegations as true] to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, the amended complaint does not consist of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements...." *Id.*

marks omitted); *accord, NCRIC, Inc. v. Columbia Hospital for Women Medical Center, Inc.,* 957 A.2d 890, 897 (D.C.2008).

Because the trial court's dismissal was based on its conclusion that Solers insufficiently pleaded harm, which is an essential element of both claims, our analysis will focus on that issue. During the April 28th hearing, the court expressed concern about, and questioned Solers extensively on, the sufficiency of its allegations of harm. Solers responded by amending its complaint to (1) identify itself as a "for-profit" corporation, (2) state that the "false statements ... [imply] that its business ethics were improper and untrustworthy ... [and that it] lacked fundamental financial integrity and honesty[,]" and (3) allege that, as a result of Doe's actions, Solers "has been deprived of its good commercial reputation, subject[ed] to contempt and ... others within [its] industry [have been deterred] from dealing with it." The amended complaint also asserts that "Doe's misconduct has caused cognizable harm in an amount to be proven at trial ... [and] has caused damage to Solers' prospective advantageous business opportunities."

■ This language alleges the type of harm that courts have required corporate plaintiffs to prove when pursuing these types of claims. *See Art Metal–U.S.A., Inc. v. United States,* 244 U.S.App. D.C. 1, 6, 753 F.2d 1151, 1156 (1985) ("a corporation suing for defamation ... may only recover actual damages in the form of lost profits"); *Southern Air Transport, Inc. v. American Broadcasting Companies, Inc.,* 670 F.Supp. 38, 41 (D.D.C.1987) ("[D]efamation suits brought by corporations will lie when 'the corporation is one for profit, and the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it ....'") (quoting RESTATEMENT (SECOND) OF TORTS § 561(a) (1977)), *aff'd,* 278 U.S.App. D.C. 222, 877 F.2d 1010 (1989); *Martin Marietta Corp. v. Evening Star Newspaper Co.,* 417 F.Supp. 947, 955 (D.D.C.1976) ("[because a corporation] has no personal reputation [it] may be libeled only by imputation about its financial soundness or business ethics") (internal citations, quotation marks, and italics omitted). Solers has not yet proven harm, but that is not the question insofar as dismissal for failure to state a claim is concerned. *See In re Curseen,* 890 A.2d at 193 ("The filing of a motion pursuant to Rule 12(b)(6) does not call upon the plaintiff to offer his proof."). Our conclusion that the amended complaint satisfies the pleading requirements of Super. Ct. Civ. R. 8(a) requires us to reverse the trial court's order of dismissal.[6]

**6.** SIIA asserts that we should not entertain this appeal because Solers in essence requested that the trial court dismiss its complaint (so that it could seek appellate review of the order denying enforcement of its subpoena). *See Ganss v. Goldenberg,* 39 App. D.C. 597, 599 (1912) (the general rule is that a party which requested or consented to a particular ruling is estopped from appealing that ruling); *Halpern v. Gunn,* 57 A.2d 741, 742 (D.C.1948) (same). The trial court's order states that it is dismissing the action "for failure to state a claim upon which relief can be granted," but, as the hearing transcript makes clear, the court understood that Solers could not go forward without the information sought by the subpoena. This was, in substance, a dis-

missal for failure to prosecute. Super. Ct. Civ. R. 41(b). *See, e.g., Dobbs v. Providence Hospital,* 736 A.2d 216, 219 (D.C.1999) (plaintiff "appeals the dismissal of her case for failure to prosecute"); *Brown v. Cohen,* 505 A.2d 77, 77 (D.C.1986) ("Appellants-plaintiffs appeal the dismissal of their suit for lack of prosecution under Super. Ct. Civ. R. 41(b).").

The posture of this case is similar to *Zassenhaus v. Evening Star Newspaper Co.,* 131 U.S.App. D.C. 384, 404 F.2d 1361 (1968), where the district court denied the plaintiffs' request for a letter rogatory. Plaintiffs' counsel then "remarked that they were unable to proceed without it 'so the case may be dis-

## V. The Order Quashing the Subpoena

This appeal presents us with issues of first impression—whether the First Amendment protects the anonymity of someone such as Doe, and, if so, under what circumstances a plaintiff such as Solers may invoke court processes to learn Doe's identity and have its day in court. Solers argues that "the First Amendment cannot be used to cloak Doe and his defamatory communications in anonymity" and that the trial court erred not only when it held Solers' discovery request to a heightened standard but also when it required Solers to "exhaust all alternative sources" before it would enforce the subpoena. SIIA, on the other hand, asserts that the trial court "applied the correct legal standard to Doe's speech" and properly "determined that a qualified First Amendment privilege applied to Solers' request for disclosure [of Doe's identity]."

Litigation of these issues usually will be governed by Civil Rule 45(c)(3)(A)(iii), which provides the basic framework: "On timely motion, the Court shall quash or modify the subpoena if it ... requires disclosure of privileged or other protected matter and no exception or waiver applies...." Super. Ct. Civ. R. 45(c)(3)(A)(iii). In our analysis we will consider the differing standards employed by other jurisdictions "[t]o balance the competing rights of anonymous internet speakers and parties seeking redress for wrongful communications...." *Mobilisa, Inc. v. Doe*, 217 Ariz. 103, 170 P.3d 712, 717 (2007).

### A. The Protection Afforded to Anonymous Speech

■ The Supreme Court of the United States has recognized that First Amendment protection extends to some anonymous speech. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (While "[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind[,] ... [t]he freedom to publish anonymously extends beyond the literary realm."). "[A] decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *Id.* Whatever the motivation, "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *Id.* at 342.

■ "It [also] is clear that speech over the internet is entitled to First Amendment protection [and that] [t]his protection extends to anonymous internet speech." *Doe v. Cahill*, 884 A.2d 451, 456 (Del.2005) (citing *Reno v. ACLU*, 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("There is 'no basis for qualifying the level of First Amendment scrutiny that should be applied to [the internet].'")); *accord, Sinclair v. TubeSockTedD*, 596 F.Supp.2d 128, 131 (D.D.C.2009) ("Such rights to speak anonymously apply ... to speech on the Internet."); *Doe v. 2TheMart.com Inc.*, 140 F.Supp.2d 1088, 1097 (W.D.Wash.2001)

missed.'" *Id.* at 386 n. 10, 404 F.2d at 1363 n. 10. The United States Court of Appeals for the District of Columbia Circuit allowed the plaintiffs to proceed with their appeal because "[t]he dismissal, though perhaps in a very loose sense solicited by appellants, was not voluntary; it was a reaction to the court's refusal to assist them in obtaining indispensable testimony." *Id.* Similarly here, Solers is unable to proceed with its case as a result of the trial court's denial of its motion to enforce the subpoena; therefore, we do not consider the dismissal to be voluntary, and Solers is not estopped from pursuing this appeal.

("[T]he constitutional rights of Internet users, including the First Amendment right to speak anonymously, must be carefully safeguarded."). "Anonymous internet speech in blogs or chat rooms in some instances can become the modern equivalent of political pamphleteering[,]" which the Supreme Court has noted " 'is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent.' " *Cahill,* 884 A.2d at 456 (quoting *McIntyre,* 514 U.S. at 357, 115 S.Ct. 1511).

 Nevertheless, " 'it is well understood that the right of free speech is not absolute at all times and under all circumstances.' " *Cahill,* 884 A.2d at 456 (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)). "Certain classes of speech, including defamatory and libelous speech, are entitled to no Constitutional protection." *Id.* " 'It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " *Id.* (quoting *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. 766). It follows that "[t]he right to speak anonymously . . . is not absolute. For example, an anonymous speaker, like a known one, has no First Amendment right to engage in . . . libel. . . ." *Mobilisa,* 170 P.3d at 717 (citing *Beauharnais v. Illinois,* 343 U.S. 250, 266, 72 S.Ct. 725, 96 L.Ed. 919 (1952)); *accord, Doe I v. Individuals,* 561 F.Supp.2d 249, 254 (D.Conn.2008) ("[T]he right to speak anonymously, on the internet or otherwise, is not absolute and does not protect speech that otherwise would be unprotected.").

## B. Balancing Competing Interests

When faced with the clash of such valued interests, we must strike a balance "between the well-established First Amendment right to speak anonymously, and the right of the plaintiff to protect its proprietary interests and reputation through the assertion of recognizable claims based on the actionable conduct of the anonymous, fictitiously-named defendant[ ]." *Dendrite International, Inc. v. Doe No. 3,* 342 N.J.Super. 134, 775 A.2d 756, 760 (2001); *accord, Cahill,* 884 A.2d at 456 ("[W]e must adopt a standard that appropriately balances one person's right to speak anonymously against another person's right to protect his reputation").[7] To meet these goals, we conclude, it is not enough that the plaintiff has successfully pleaded a claim of defamation. Before enforcing a subpoena for identifying information, a court must conduct a preliminary screening to ensure that there is a viable claim that justifies overriding an asserted right to anonymity.

The tension between a speaker's desire for anonymity and the right of the plaintiff to protect his reputation or property arises in a variety of contexts, including defamation, copyright infringement, harassment, and malicious gossip. *See, e.g., Doe I v. Individuals,* 561 F.Supp.2d at 251 (plaintiffs alleged they were targets of defamatory, threatening, and harassing comments); *Highfields Capital Management, L.P. v. Doe,* 385 F.Supp.2d 969, 971 (N.D.Cal.2005) (plaintiff alleged defamation, commercial disparagement, and

---

7. *See also In re Subpoena Duces Tecum to America Online, Inc.,* No. 40570, 2000 WL 1210372 at *6, 52 Va. Cir. 26 (2000) ("Those who suffer damages as a result of tortious or other actionable communications on the Internet should be able to seek appropriate redress by preventing the wrongdoers from hiding behind an illusory shield of purported First Amendment rights."), *rev'd on other grounds, America Online, Inc. v. Anonymous Publicly Traded Co.,* 261 Va. 350, 542 S.E.2d 377 (2001).

trademark claims); *Mobilisa*, 170 P.3d at 715–16 (plaintiff alleged violations of federal law regarding electronic communications, as well as trespass to chattels). Because the interests at stake will vary, a trial court may need to modify the test we adopt depending on the type of injury alleged. In other words, one size does not necessarily fit all. Here we are faced with a claim of defamation, and we therefore formulate a general framework to fairly accommodate the reputational interests of the plaintiff and the First Amendment rights of the anonymous defendant.[8]

### C. The Tests Used by Other Jurisdictions

Courts have applied a variety of tests to grapple with the question of when it is appropriate to force a third party to reveal the identity of a defendant charged with defamation. One of the standards most easily satisfied requires only that the court be convinced that the party seeking the subpoena "has a legitimate, good faith basis to contend that it may be the victim of [actionable] conduct...." *In re Subpoena Duces Tecum to America Online, Inc.*, 2000 WL 1210372 at *8, 52 Va. Cir. 26 (2000), *rev'd on other grounds, America Online, Inc. v. Anonymous Publicly Traded Co.*, 261 Va. 350, 542 S.E.2d 377 (2001). In our view, the "good faith test" insufficiently protects a defendant's anonymity: "Plaintiffs can often initially plead suffi-

cient facts to meet the good faith test ... even if the defamation claim is not very strong, or worse, if they do not intend to pursue the defamation action to a final decision." *Cahill*, 884 A.2d at 457. The good faith test and the similarly lax motion to dismiss test may needlessly strip defendants of anonymity in situations where there is no substantial evidence of wrongdoing, effectively giving little or no First Amendment protection to that anonymity.[9]

Toward the other end of the spectrum is the test articulated by the New Jersey Superior Court in *Dendrite International, Inc. v. Doe No. 3*, 342 N.J.Super. 134, 775 A.2d 756, 760–61 (2001), which requires plaintiffs to "produce sufficient evidence supporting each element of its cause of action, on a prima facie basis," after which the court would "balance the defendant's First Amendment right of anonymous free speech against the strength of the prima facie case presented and the necessity for the disclosure ... to allow the plaintiff to properly proceed." The Maryland Court of Appeals recently adopted this test in *Independent Newspapers, Inc. v. Brodie*, 407 Md. 415, 966 A.2d 432 (2009). There, a prominent businessman sued a local newspaper company that maintained an internet forum where the public was allowed to comment on community events. Several individuals, identified only by their internet pseudonyms, used this forum to

---

8. Solers has also alleged tortious interference with prospective advantageous business opportunities. We do not address that claim separately in this context because we view the alleged injury as a consequence of the defamation. Indeed, that count of the amended complaint specifically alleges that "[s]uch damage was proximately caused by the false and defamatory statements published by Defendant." We are satisfied that Solers has sufficiently alleged the elements of this tort to survive a motion to dismiss under Civil Rule 12(b)(6). Furthermore, contrary to SIIA's argument, Solers has not abandoned this claim.

9. Although not expressly proposing a test, Solers appears to advocate a "motion to dismiss" standard, whereby the plaintiff's subpoena is enforced if its complaint adequately states a claim upon which relief can be granted. Such a standard may provide meaningful protection in a jurisdiction that has stricter pleading requirements than we do. *See Lassa v. Rongstad*, 294 Wis.2d 187, 718 N.W.2d 673, 687 (2006) (adopting a motion to dismiss standard because Wisconsin procedural rules require the plaintiff to plead the defamatory words with particularity, and establish that the words are capable of defamatory meaning).

make disparaging comments regarding Brodie's business. *Id.* at 435, 442–44. Brodie sued the newspaper and the anonymous participants, alleging defamation and conspiracy to defame. *Id.* at 442. Although the trial court dismissed the newspaper company from the suit, it granted a motion to compel the company to comply with Brodie's subpoena seeking the identities of the anonymous critics. *Id.* at 445.

The Maryland Court of Appeals reversed because Brodie had failed to sue, within the time allowed by the statute of limitations, those persons who had actually posted the allegedly defamatory comments. *Id.* at 449. Although dismissing on procedural grounds, the court adopted the *Dendrite* test for use in future internet cases:

> [W]hen a trial court is confronted with a defamation action in which anonymous speakers or pseudonyms are involved, it should, (1) require the plaintiff to undertake efforts to notify the anonymous posters that they are the subject of a subpoena or application for an order of disclosure, including posting a message of notification of the identity discovery request on the message board; (2) withhold action to afford the anonymous posters a reasonable opportunity to file and serve opposition to the application; (3) require the plaintiff to identify and set forth the exact statements purportedly made by each anonymous poster, alleged to constitute actionable speech; (4) determine whether the complaint has set forth a prima facie defamation per se or per quod action ...; and (5), if all else is satisfied, balance the anonymous poster's First Amendment right of free speech against the *strength* of the *prima facie* case of defamation presented by the plaintiff and the necessity for disclosure of the anonymous defendant's identity, prior to ordering disclosure.

*Id.* at 457 (emphasis in original). Three judges of the Maryland Court of Appeals concurred with the result, but believed that the final balancing test of the *Dendrite* standard is "unnecessary and needlessly complicated." *Id.* at 458 (Adkins, J., concurring) (citing *Cahill,* 884 A.2d at 461). Moreover, they observed, the majority had not explained "how the interests that trial courts are to balance differ from the interests that are already balanced in developing the substantive law of defamation." *Id.* at 459 (Adkins, J., concurring). The concurring opinion in *Brodie* also articulated an additional reason why we decline to adopt the standard set forth in the majority opinion: "the majority is not clear whether or not a plaintiff must make [the] *prima facie* showing by an affidavit, deposition, or other statement under oath, or whether mere allegations of fact are sufficient." *Id.* at 457 (Adkins, J., concurring) (footnote omitted).

The Supreme Court of Delaware adopted a modified version of the *Dendrite* test in *Cahill,* 884 A.2d 451, holding "that before a defamation plaintiff can obtain the identity of an anonymous defendant through the compulsory discovery process he must support his defamation claim with facts sufficient to defeat a summary judgment motion." *Id.* at 460. "In other words," and this is an important qualification, "the defamation plaintiff, as the party bearing the burden of proof at trial, must introduce evidence creating a genuine issue of material fact for all elements of a defamation claim *within the plaintiff's control.*" *Id.* at 463 (emphasis in original). In addition, "to the extent reasonably practicable under the circumstances, the plaintiff must undertake efforts to notify the anonymous poster that he is the subject of a subpoena or application for order of disclosure [and] withhold action to afford the anonymous defendant a reasonable opportunity to file and serve opposi-

tion to the discovery request." *Id.* at 460–61. The important feature of *Dendrite* and *Cahill* is to emphasize that the plaintiff must do more than simply plead his case.

## D. A Test for the District of Columbia

 Procedural labels such as *prima facie* or "summary judgment" may prove misleading, but the test we now adopt closely resembles the "summary judgment" standard articulated in *Cahill.*[10] When presented with a motion to quash (or to enforce) a subpoena which seeks the identity of an anonymous defendant, the court should: (1) ensure that the plaintiff has adequately pleaded the elements of the defamation claim, (2) require reasonable efforts to notify the anonymous defendant that the complaint has been filed and the subpoena has been served, (3) delay further action for a reasonable time to allow the defendant an opportunity to file a motion to quash, (4) require the plaintiff to proffer evidence creating a genuine issue of material fact on each element of the claim that is *within its control,* and (5) determine that the information sought is important to enable the plaintiff to proceed with his lawsuit. We do not require a separate balancing test at the end of the analysis, nor do we require a showing that the plaintiff has exhausted alternative sources for learning the information. This brief summary of our test must be read in context of the discussion that follows.

Before enforcing a subpoena seeking the identity of an anonymous user of the internet, the court must first determine wheth-er the plaintiff has adequately pleaded each element of his claim. If the complaint cannot survive scrutiny for failure to state a claim, there is no justification for going further.

This is only the first step, however. If the complaint is adequate, the court then must ensure that reasonable efforts are made to notify the defendant that the subpoena has been served. Many courts have required the plaintiff to provide this notice, usually by posting it in the same manner in which the allegedly defamatory statement was published. *See, e.g., Cahill,* 884 A.2d at 461 (requiring a plaintiff who alleges defamation has occurred over the internet to post on the message board where the offending comment was located a notice informing the anonymous defendant that the subpoena has been served); *Dendrite,* 775 A.2d at 760 ("[N]otification efforts should include posting a message of notification of the identity discovery request to the anonymous user on the ISP's pertinent message board."). Nevertheless, it often will be simpler and more effective to require the recipient of the subpoena (who likely knows the identity of the anonymous defendant, or at least knows how to contact him) to provide such notice. *See, e.g., Doe I v. Individuals,* 561 F.Supp.2d at 252 ("AT & T sent a letter to the person whose internet account corresponded with the IP address at issue."); *Mobilisa,* 170 P.3d at 721 ("the superior court did not err by . . . plac[ing] the burden on [the e-mail service provider] to notify Doe of the pending proceedings"); *Krinsky,* 72 Cal.

---

**10.** We are aware of the criticism of *Cahill* voiced in *McMann v. Doe,* 460 F.Supp.2d 259, 267–68 (D.Mass.2006). We think, however, that these concerns are addressed by our suggestion below that the trial court may in difficult cases decide to proceed in stages and to allow limited discovery before quashing or enforcing the subpoena. Moreover, the "within the plaintiff's control" limitation em-bodied in the *Cahill* test provides valuable flexibility. The court in *McMann* agreed that "it is reasonable to apply some sort of a screen to the plaintiff's claim before authorizing the subpoena." *Id.* at 268. It did not need to develop a test of its own because it concluded that plaintiff had failed to state a claim on which relief could be granted. *Id.*

Rptr.3d at 235 (Yahoo! notified the defendant that it would comply with the subpoena in 15 days unless he filed a motion to quash); *Immunomedics, Inc. v. Doe,* 342 N.J.Super. 160, 775 A.2d 773, 775 (2001) (Yahoo! contacted defendant Jean Doe). We leave it to the trial court to determine in the circumstances of each case who should notify the anonymous defendant of the efforts to discover his identity. In this case, we are informed, SIIA notified Doe that the subpoena had been served.

Once suitable efforts have been made to notify the defendant, the court should delay action to allow him a reasonable opportunity to file a motion to quash the subpoena. "A court should not consider impacting a speaker's First Amendment rights without affording the speaker an opportunity to respond to the discovery request." *Mobilisa,* 170 P.3d at 719. In several cases, the anonymous defendant has actually appeared in the litigation through counsel. *See, e.g., Doe I v. Individuals,* 561 F.Supp.2d at 250–51 (Doe 21 moved to quash plaintiffs' subpoena); *Mobilisa,* 170 P.3d at 716 (Doe appeared through e-mail service provider's counsel to contest the trial court's order allowing the plaintiff to conduct discovery); *Krinsky,* 72 Cal.Rptr.3d at 234 (Doe 6 moved to quash the subpoena); *In re Does 1–10,* 242 S.W.3d 805, 810 (Tex.App.2007) (Doe 1 sought mandamus relief from order requiring the internet service provider to disclose his identity).

The plaintiff next is required to proffer evidence to show that it has a viable claim of defamation. Whether this evidence is presented in the form of affidavits, deposition transcripts, or courtroom testimony under oath, it must be sufficient to create a genuine issue of material fact with respect to all the elements of the defamation claim *within the plaintiff's control, see Cahill,* 884 A.2d at 463—"in other words, all elements not dependent upon knowing the

identity of the anonymous speaker." *Mobilisa,* 170 P.3d at 720. (Because of unpredictable variations among cases, we leave the determination of which elements are within a particular plaintiff's control to the informed discretion of the trial judge.) "Requiring the requesting party to satisfy this step furthers the goal of compelling identification of anonymous internet speakers only as a means to redress . . . misuses of speech rather than as a means to retaliate against or chill legitimate uses of speech." *Mobilisa,* 170 P.3d at 720.

■ An important part of this process is to set forth as precisely as possible the statements by the anonymous defendant that are alleged to be defamatory. In some cases, the court has refused to compel disclosure of the defendant's identity because the statements were not actionable. *See, e.g., Highfields Capital Management,* 385 F.Supp.2d at 979 ("In context, [the statements] are clearly sardonic opinion or parody, not to be taken seriously by anyone."); *Krinsky,* 72 Cal.Rptr.3d at 250 ("the statements of which plaintiff complains are not actionable"); *Dendrite,* 775 A.2d at 772 ("Dendrite failed to establish a sufficient nexus between John Doe No. 3's statements and Dendrite's allegations of harm"); *Greenbaum v. Google, Inc.,* 18 Misc.3d 185, 845 N.Y.S.2d 695, 700 (N.Y.Sup.Ct.2007) (statements were "not reasonably susceptible of a defamatory connotation").

■ The court should also ensure that the information sought is important to the litigation. This portion of the test is easily satisfied when the anonymous speaker is the defendant and the litigation cannot proceed without serving him with process. *Doe I v. Individuals,* 561 F.Supp.2d at 255 ("[C]learly the defendant's identity is central to Doe II's pursuit of her claims against him."). We do not, in these circumstances, require a showing that the

plaintiff has exhausted alternative sources for learning the information. When the other elements of the test have been satisfied, we see little point in requiring the plaintiff to travel more circuitous trails in search of Doe's identity.[11]

Finally, we agree with the concurring judges in *Brodie* that a separate balancing test at the end of the analysis is not necessary. *See Cahill*, 884 A.2d at 461 (no balancing test is required because "[t]he summary judgment test is itself the balance"). "When there is a factual and legal basis for believing libel may have occurred, the writer's message will not be protected by the First Amendment. Accordingly, a further balancing of interests should not be necessary to overcome the defendant's constitutional right to speak anonymously." *Krinsky*, 72 Cal.Rptr.3d at 245–46 (citations omitted).[12]

SIIA protests that enforcement of subpoenas like this one will have a chilling effect on reporting of software piracy: "Because few would-be Internet communicators seeking to report potential software piracy would risk the financial and other burdens of defending a lawsuit, that speech likely would disappear." This forecast includes hyperbole, no doubt, but the test we have adopted takes this concern into account. As the previous discussion should make clear, we do not take lightly a person's decision to speak anonymously. But that is not an absolute right, and SIIA's website alerted John Doe that SIIA might be required to disclose his identity.[13] We do not question the importance of com-

---

11. We are not dealing here with a subpoena seeking to compel a non-party journalist to reveal confidential sources. Additional First Amendment interests are involved in such cases, and it may be appropriate there to require the exhaustion of alternative sources. *See generally Hatfill v. Gonzales*, 505 F.Supp.2d 33 (D.D.C.2007).

12. Asserting that Doe's speech consisted of "defamatory statements to a private organization about a private person," Solers insists that "the First Amendment does not protect this kind of purely private defamation." We have already explained that the First Amendment does not protect defamatory speech, and it may turn out that Solers is correct. But we are at the threshold of litigation in this case, and Solers has yet to prove any element of defamation.

Solers relies on *Ayala v. Washington*, 679 A.2d 1057 (D.C.1996), for the proposition that Doe cannot remain anonymous because he is not entitled to First Amendment protection at all. This argument reads *Ayala* much too broadly. *Ayala* was concerned with the burden of proof applicable to a claim of defamation. 679 A.2d at 1063–64. The plaintiff there had proven malice, falsity, and publication by a preponderance of the evidence, and the court confronted the issue of whether he had to meet the stricter standard of clear and convincing evidence to satisfy First Amend-

ment concerns. *Id.* Holding that Ayala was not a public figure, and that the allegations the defendant made to his employer were of private concern, we concluded that it was not necessary to apply the higher standard of proof. *Id.* at 1068–69.

Although we spoke broadly in *Ayala* of "the universe of First Amendment defamation law" and "whether a particular speech is the kind that merits constitutional protection," 679 A.2d at 1062–63, we did not deal at all with the right to speak anonymously. Thus, the holding of *Ayala* does not govern here. Moreover, courts have applied the standard for unmasking anonymous defendants in cases brought by non-public figures. *See, e.g., Doe I v. Individuals*, 561 F.Supp.2d at 256–57 (acknowledging the protections granted to an anonymous defendant, but finding that the non-public figure plaintiff had made a prima facie showing of defamation and was therefore entitled to learn the defendant's identity); *Krinsky*, 72 Cal.Rptr.3d at 234 (protecting the anonymity of an internet commentator accused of defaming a non-public figure plaintiff).

13. The description of SIIA's Corporate Anti–Piracy Reward Program on the website refers to SIIA's "long standing policy of keeping the identity of our sources anonymous (unless required by law to disclose the identity)."

bating software piracy,[14] but that is only one of the interests we must balance.[15]

### E. Applying the Test to Solers' Subpoena

There is an interesting factual difference between this case and many of those to which we have referred. Here, John Doe did not post his accusations on an internet bulletin board for thousands or perhaps millions of persons to see. *Cf. Doe I v. Individuals*, 561 F.Supp.2d at 251 (The website where the defendants posted their messages "draws between 800,000 and one million visitors per month. Anyone who can access the internet can access [the website] and view the messages posted on its discussion boards."); *Krinsky*, 72 Cal. Rptr.3d at 237 ("The poster's message not only is transmitted instantly to other subscribers to the message board, but potentially is passed on to an expanding network of recipients, as readers may copy, forward, or print those messages to distribute to others."). Instead, he apparently followed the instructions on SIIA's website and used the internet to report his allegations directly and more privately. For all that we know at this point, the transmission of his accusations was not substantively different from dropping a letter into the mail, making a phone call, or slipping a note under the door.

A similar point was addressed in *Cahill*, where the court drew "no distinction between communications made on the internet and those made through other traditional forms of media in determining the standard to be applied." 884 A.2d at 465. The court decided that, "whenever a defamation plaintiff seeks to unmask an anonymous defendant, [it would] apply the summary judgment standard regardless of the chosen medium of publication." *Id.* In this case, we need not, and do not, decide whether the test we have adopted should

---

**14.** Software piracy is a serious global problem. *See Fifth Annual BSA and IDC Global Software Piracy Study 2007*, available at http://global.bsa.org/idcglobalstudy2007 (reporting that losses from piracy in 2007 amount to $48 billion dollars). Piracy has a particularly devastating effect on the economy of the United States, which holds a large share of the software market. *See The Economic Benefits of Reducing PC Software Piracy*, available at http://www.bsa.org/idcstudy (January 2008) (predicting that "if America's PC software piracy rate were to be lowered 10 percentage points over the next four years," it would create "an additional 32,031 jobs, $41 billion in local industry revenues and $6.7 billion in additional tax revenues for federal, regional, and local governments.").

**15.** *Amicus curiae* asserts that efforts to learn the identity of informants such as Doe infringe upon "the freedom of speech and the freedom of association of John Doe, SIIA, and its members." It is not clear that we should address this "freedom of association" argument at all, because it has not been briefed by SIIA on appeal and was barely mentioned in the trial court. Nevertheless, we consider and reject this claim because the record and the case law do not support it. "To establish such a violation, the target of a subpoena must make a prima facie showing of a first amendment infringement—typically, that enforcement of the disclosure requirement will result in harassment of current members, a decline in new members, or other chilling of associational rights." *United States v. Comley*, 890 F.2d 539, 544 (1st Cir.1989). There has been no such showing here. *See Lassa v. Rongstad*, 294 Wis.2d 187, 718 N.W.2d 673, 691 (2006) (affidavit of association's leader did not "establish[ ] a reasonable probability of such chilling effects"; it contained at most a "general statement of subjective fear of reprisal without any basis in objective, particularized facts[,]" which is "precisely what is ordinarily deemed insufficient[.]"); *United States v. Judicial Watch, Inc.*, 362 U.S.App. D.C. 1, 10, 371 F.3d 824, 833 (2004) ("Judicial Watch has not produced sufficient evidence to support its allegation that enforcement of the summons will chill its members' speech."); *United States v. Duke Energy Corp.*, 232 F.R.D. 1, 3 (D.D.C.2005) (rejecting objections that compliance with subpoena would chill First Amendment associational rights).

apply to all other forms of communication. Nevertheless, we will apply it to various uses of the internet, recognizing that the factual differences we have highlighted surely are relevant to assessing the proof of defamation, including the elements of publication and harm.

Solers argues that it is unfair to require production of evidence at this early stage of the proceedings, pointing out that, in more typical litigation, substantial discovery would occur before a party would need to file or defend against a motion for summary judgment. It is important to emphasize in response that we do not expect Solers to demonstrate that it is entitled to judgment in its favor. Rather, Solers merely must show that it has a viable claim of defamation—that there is a genuine issue of material fact on each element of the claim that does not depend on knowing the defendant's identity. Moreover, this is a test for deciding whether to enforce or quash the subpoena. If the court decides to quash, it will have to determine after a separate inquiry whether to prolong the litigation or to dismiss the complaint for failure to prosecute.

Recognizing Solers' dilemma, the trial court may choose to allow some discovery before deciding whether to order disclosures that will reveal the identity of Doe. Here, for example, Solers does not know the exact statements made by John Doe (although one may fairly infer their nature from the accusations made in the demand letter sent by SIIA's attorney). It might be useful as a preliminary step to order SIIA to disclose those statements, if that can be done without revealing Doe's identity. Or, perhaps, the court could allow limited discovery to determine whether the

court may exercise personal jurisdiction over Doe.[16] The court need not decide at the very outset of the litigation whether to compel SIIA to disclose the identity of John Doe.

It should be obvious that a key issue on remand will be determining what types of evidence the court reasonably may expect Solers to proffer without knowing the identity of John Doe. Applying this aspect of the test will require sensitivity to the unique circumstances of each case. It may, for example, be difficult for Solers to discern the defendant's motive—and thus his state of mind—without knowing his identity. See Cahill, 884 A.2d at 464 (holding that the public figure plaintiff need not produce evidence showing that the defendant acted with actual malice because, "[w]ithout discovery of the defendant's identity, satisfying this element may be difficult, if not impossible."); Mobilisa, 170 P.3d at 723 n. 12 (stating that knowledge of Doe's intent depends on his identity).

 Nevertheless, in this context, a plaintiff must do more than simply plead his case. Solers acknowledges that it did not present evidence to support its allegations of damage, but claims it did not know it was expected to do so at this stage of the proceedings. In other words, Solers believed that the trial court was applying a "motion to dismiss" standard and would focus only on the allegations in its complaint. See In re Curseen, 890 A.2d at 193 ("The filing of a motion pursuant to Rule 12(b)(6) does not call upon the plaintiff to offer his proof."). We think this is a fair point. At the time the parties were litigating this issue in the trial court, no test had yet been established in this jurisdiction for

---

**16.** See Eric T. v. National Medical Enterprises, Inc., 700 A.2d 749, 759 n. 21 (D.C.1997) ("A plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of the trial court by withholding information on its contacts with the forum.") (internal citation and quotation marks omitted).

enforcing a subpoena of this nature. It would be unfair to assess Solers' proffer (or lack thereof) under the standard we have announced today. We therefore vacate the judgment of the Superior Court and remand this case to give Solers an opportunity to present *evidence* supporting its claim of defamation.[17]

*So ordered.*

---

**17.** We decline SIIA's suggestion that we affirm on alternative grounds not addressed by the trial court. This record discloses no reason to think that all documents responsive to the subpoena are protected by the work product doctrine. *See generally In re Artis,* 883 A.2d 85, 100 n. 17 (D.C.2005) ("The work product doctrine ... creates a 'qualified privilege' for materials prepared by an attorney (or attorney's agent) in anticipation of trial.") (internal citations and quotation marks omitted). If the trial court is inclined upon remand to enforce the subpoena in whole or in part, this qualified privilege may be invoked on a document-by-document basis. Likewise, it is premature to conclude that the Superior Court is unable to exercise personal jurisdiction over John Doe. The allegations of the Amended Complaint suggest that Doe's activities brought him within reach of the District of Columbia's long-arm statute. *See* D.C.Code § 13–423(a)(3) (2001).