*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 19-CV-195 & 19-CV-646

CLOSE IT! TITLE SERVICES, INC., D/B.A.
FEDERAL TITLE & ESCROW CO., *et al.*, APPELLANTS,

v.

MICHAEL S. NADEL, *et al.*, APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(CAB-5391-18)

(Hon. William M. Jackson, Trial Judge)

(Argued December 10, 2020　　　　　　　　Decided April 8, 2021)

*Stacey G. Evans*, with whom *Jeffrey N. Williams* and *Andrew J. Lawrence*, were on the brief for appellants.

*Bryan A. Carey*, attorney for *Sean Smith* and *Erin Wrona*, were on the brief, for appellees.

*Roger E. Warin* with whom *Michael E. Stoll*, attorneys for *McDermott Will & Emery LLP* and *Michael S. Nadel*, were on the brief, for appellees.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON, *Associate Judge*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*: A local radio station published statements by attorney Michael Nadel, a partner at McDermott Will & Emery LLP ("McDermott

Will"), about appellant, Federal Title & Escrow Co. ("Federal Title"),[1] in connection with his firm's representation of Sean Smith and Erin Wrona in a lawsuit against Federal Title for the loss of $1.57 million held in escrow. Considering these statements to be defamatory and otherwise tortious, the appellants (Federal Title and its owner, Todd Ewing) sued the appellees (Nadel, McDermott Will, Smith, and Wrona) for damages, as well as a published retraction of Nadel's statements and their removal from all websites. Appellees filed a motion to dismiss for failure to state a claim under Super. Ct. Civ. R. 12(b)(6), as well as a special motion to dismiss under the District of Columbia Anti-Strategic Lawsuits Against Public Participation Act ("Anti-SLAPP Act").[2]

The trial court granted appellees' 12(b)(6) motion to dismiss based on its determination that appellants failed to plead any viable claim. The court also granted appellees' anti-SLAPP motion to dismiss, concluding that they had made the required prima facie showing that Nadel's statements comprised "an act in furtherance of the right of advocacy on issues of public interest[,]"[3] unrebutted by

_____

[1] Federal Title & Escrow Co. is the name under which Close It! Title Services, Inc., does business.

[2] D.C. Code §§ 16-5501-5505.

[3] D.C. Code § 16-5502(b).

appellants, and thus that appellants' claims could not succeed on the merits.  The trial court then awarded appellees their attorneys' fees under the Anti-SLAPP Act fee-shifting provision.[4]

We conclude that the trial court correctly dismissed appellants' claims for defamation and false light invasion of privacy but erred in dismissing their claim for tortious interference with business relations.  Furthermore, the trial court erred in granting appellees' anti-SLAPP motion to dismiss and awarding them attorneys' fees.  Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

## I.  Factual Background and Procedural History

In May 2017, appellees Smith and Wrona hired Federal Title to assist them with closing on the purchase of a home in the Cleveland Park neighborhood, and they wired $200,000.00 to Federal Title as an earnest-money deposit.  A few days later, they received an email from the email address of Melina Schifflett, the Federal Title employee with whom they had been working, requesting that they wire the remaining $1.57 million of the home's purchase price.  Smith and Wrona

_____

[4] *See* D.C. Code § 16-5504.

complied, despite being wary that the receiving bank account was different from the one used for the earlier wire and was associated with an unfamiliar entity designated JMZ Equities, LLC ("JMZ"). At the scheduled closing in June 2017, Ewing informed Smith and Wrona that Federal Title never received the $1.57 million wire. The closing was postponed, and Ewing promptly notified the FBI. Several days later, appellant Ewing told Smith that Federal Title's computer system had been hacked and Schifflett's email address had been commandeered to intercept the funds from the second wire.

In August 2017, Smith and Wrona filed a federal RICO suit against appellants Federal Title and Ewing, as well as against Schifflett, JMZ, and Jeff Zorbo (JMZ's owner). Shortly after the suit was filed, Nadel was interviewed by a reporter from the local public radio station, WAMU, resulting in publication of the following statements carried both on the air and on WAMU's website:

> "Federal Title either caused our money to be stolen or stole it, and we need to get our money back," said Michael Nadel, the couple's attorney. "We don't have any evidence that it happened because of hackers other than Federal Title's say-so." Nadel also says Federal Title, which has offices in Friendship Heights and Logan Circle, failed to effectively communicate with Smith and Wrona ahead of the closing—a situation he attributes to the company being involved in the scheme. "Federal Title never called Sean Smith and said, 'Bring your

money to closing,' and didn't even bring it up until the middle of closing. So if they weren't responsible for helping steal the money, it certainly seems like they knew well in advance of that closing that the money was gone. Their conduct shows that," he said.

McDermott Will published on its website a link to the WAMU story and repeated on the website Nadel's statements that Federal Title had "either caused our money to be stolen or stole it," and that "if they weren't responsible for helping steal the money, it certainly seems like they knew well in advance of that closing that the money was gone." Several days later, Federal Title notified Nadel and McDermott Will by letter that the statements were defamatory, causing it "immediate and irreparable harm," and should be retracted. Nadel and McDermott Will acknowledged receipt of the letter but refused a retraction.

In June 2018, the district court dismissed Smith and Wrona's federal suit because they had failed to plead facts sufficient for a RICO claim.[5] The court declined to exercise supplemental jurisdiction over the remaining District-law claims. Smith and Wrona promptly filed a complaint in Superior Court alleging, *inter alia*, a conspiracy to commit theft or, alternatively, negligence by Federal Title associated with JMZ's alleged hack of its computer system. The case was

---

[5] *Smith v. Fed. Title & Escrow Co.*, No. 17-CV-1580, 2018 U.S. Dist. LEXIS 104062, at *15-10 (D.D.C. June 21, 2018).

referred to mediation, and in April 2019 a joint stipulation was filed that dismissed with prejudice all of Smith's and Wrona's claims against appellants and Schifflett.

Meanwhile, in July 2018, Federal Title and Ewing had filed a complaint in Superior Court against appellees alleging defamation, false light invasion of privacy, and tortious interference with business relations, all based on Nadel's statements to WAMU. Appellees moved to dismiss the complaint for failure to state a claim under both Rule 12(b)(6) and the Anti-SLAPP Act.

In October 2018, the trial court granted appellees' motions to dismiss on both grounds. As to Rule 12(b)(6), the court ruled that: (1) Nadel's statements were not reasonably susceptible of a defamatory meaning in the context of WAMU's article and, in any event, were protected by the fair-report and judicial-proceedings privileges; (2) the false light claim necessarily failed because the defamation claim was deficient; and (3) as to alleged tortious interference, the complaint failed to specify the business or contractual relationships allegedly damaged by Nadel's statements. Moreover, as to appellees' anti-SLAPP motion to dismiss, the trial court concluded that the statute applied because the case "arises from privileged statements made . . . to a WAMU reporter after the filing of the . . . federal lawsuit[]," and it concerns an "issue of public interest," namely,

"the importance of cybercrime." The trial court further found that the Rule 12(b)(6) shortcomings prevented appellants from demonstrating that they were likely to succeed on the merits of their claims, and thus that dismissal was required under the Anti-SLAPP Act. Appellees then filed motions for attorneys' fees under that statute.

In November 2018, the trial court granted appellants' timely motion to reconsider the dismissal because the court had failed to acknowledge appellants' filed oppositions and also had failed to conduct the required hearing on an anti-SLAPP motion to dismiss. On February 5, 2019, after the required hearing the previous month, the trial court affirmed its October 2018 dismissal order. Appellants timely appealed the February 5 order in Case No. 19-CV-195.

On February 25, 2019, the trial court granted Smith's and Wrona's motion for attorneys' fees under the Anti-SLAPP Act and awarded them $24,340.00. In June 2019, Smith and Wrona filed a motion for an amended order, *nunc pro tunc,* to require payment of the fee award to appellants jointly and severally, because omission of that requirement had prevented them from registering the order as a judgment in Maryland. Appellants filed an opposition, arguing that the February 25 order was not a final, appealable order because Nadel's and McDermott's

attorneys' fee motion was unresolved and, in any event, because Smith's and Wrona's requested addition was a substantive change inappropriate for a *nunc pro tunc* order. Smith and Wrona filed a reply arguing that the February 25 order was appealable because it had been issued after the February 5 dismissal order. On July 2, 2019, the trial court issued an amended fees order granting Smith's and Wrona's requested addition. Also on July 2, 2019, the trial court granted, in part, Nadel's and McDermott Will's motion for attorneys' fees under the Anti-SLAPP Act, halving their requested amount to $85,402.85. Appellants timely appealed the July 2 orders in Case No. 19-CV-646. On December 19, 2019, this court, consolidated the appeals.

## II. Standard of Review

A complaint is subject to dismissal under Super. Ct. Civ. R. 12(b)(6) for failure to state a claim on which relief can be granted if it does not satisfy the requirement, set forth in Super. Ct. Civ. R. 8(a)(2), that it contain a "short and plain statement of the claim showing that the pleader is entitled to relief."[6] The plaintiff

---

[6] *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011).

is not required, however, to include "detailed factual allegations."[7] All factual allegations in a complaint challenged under Rule 12(b)(6) must be presumed true and liberally construed in the plaintiff's favor.[8] That said, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face,"[9] and the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[10] "[A]lthough a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely,"[11] the "factual allegations must be enough to raise a right to relief above the speculative level."[12]

---

[7] *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[8] *See Grayson v. AT&T Corp.*, 15 A.3d 219, 228-29 (D.C. 2011) (en banc).

[9] *Potomac Dev. Corp.*, 28 A.3d at 544 (quoting *Iqbal*, 556 U.S. at 678).

[10] *Id*.

[11] *Grayson*, 15 A.3d at 229.

[12] *OneWest Bank, FSB v. Marshall*, 18 A.3d 715, 721 (D.C. 2011) (quoting *Chamberlain v. American Honda Fin. Corp.*, 931 A.2d 1018, 1023 (D.C. 2007)).

This court reviews "an order granting a motion to dismiss *de novo*."[13] Similarly, the court examines the prima facie showing requirement for a special, anti-SLAPP motion to dismiss under D.C. Code § 16-5502(b) and the relevant definitional provisions in D.C. Code § 16-5501 *de novo*.[14]

## III. Analysis

### A. The 12(b)(6) Motions to Dismiss

#### 1. Defamation

A claim for defamation must allege:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.[15]

---

[13] *Ludwig & Robinson, PLLC v. BiotechPharma, LLC*, 186 A.3d 105, 109 (D.C. 2018) (internal citations and quotations omitted).

[14] *See Saudi Am. Pub. Rels. Affs. Comm. v. Inst. for Gulf Affs.*, 242 A.3d 602, 607 (D.C. 2020) (citing *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213, 1233 (D.C. 2016), as amended (Dec. 13, 2018)).

[15] *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)).

The trial court dismissed this claim by appellant Ewing, concluding that the complaint "fail[ed] to allege any statements made by any of the defendants concerning him in an individual capacity." Also, the court dismissed the defamation claim by Federal Title, determining that Nadel's statements, "when read in context, were not reasonably capable of conveying a false and defamatory message." As to both, we agree.

When examining a defamation claim, we cannot separate the words from their context.[16] As the trial court correctly concluded, when one considers Nadel's statements in context, it is clear that he is communicating no more than his theory of his clients' case.[17] While appellants are correct in observing that statements which tend to "injure [the] plaintiff in his trade, profession or community standing"

_____

[16] *See Clawson v. St. Louis Post-Dispatch, L.L.C.*, 906 A.2d 308, 313-14 (D.C. 2006) ("[A] statement . . . may not be isolated and then pronounced defamatory, or deemed capable of defamatory meaning. Rather, any single statement or statements must be examined within the context of the entire [article]."); *see also Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984) ("The plaintiff has the burden of proving the defamatory nature of the publication, and the publication must be considered as a whole, in the sense in which it would be understood by the readers to whom it is addressed.") (internal citations omitted).

[17] *See Guilford Trans. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000) ("[I]f it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.") (internal quotations omitted).

are important considerations in evaluating a defamation claim, "[a]n allegedly defamatory remark must be more than unpleasant or offensive; the language must make [appellants] appear odious, infamous, or ridiculous."[18]  It is therefore certainly the case that, if Nadel had simply asserted that Federal Title had stolen Smith's and Wrona's money, appellants likely would have appeared "infamous." But the language used and its context made it clear to the audience "to whom it was addressed"[19] – the general public – that appellees were not sure what happened to the money but held Federal Title legally responsible because they either "help[ed] steal the money" or "seem[ed] like they knew" what happened to it.[20]  In the context of the radio reporter's interview and related article, it would have been

_____

[18] *Klayman v. Segal*, 783 A.2d 607, 613 (D.C. 2001).

[19] *Best*, 484 A.2d at 969.

[20] During oral argument, appellants' counsel, for the first time, distinguished between the comments Nadel had made on air and his statements as reported in the WAMU article.  She observed that, although the article may have given a reader enough context to preclude Nadel's statements from being defamatory, a listener to the radio broadcast may not have been aware of the context.  While it is true that an audience member could tune in at any time of the broadcast and hear a portion of the statements that were arguably defamatory, appellants have not claimed that what was said on the air differed from what was written in the article.  The possibility that a portion of the statements could have been heard out of context does not obviate the need for us to read them in their full context.  In any event, this court does not normally consider new arguments on appeal. *See Thornton v. Norwest Bank of Minnesota*, 860 A.2d 838, 842 (D.C. 2004) (internal citations omitted).

clear to the audience that, considered objectively, Nadel was speaking as an attorney, espousing a theory of liability to serve his clients' interests,[21] not making a personal accusation that appellants were "odious, infamous, or ridiculous."

Because Nadel's statements were not capable of a defamatory meaning, appellants' identical defamation claim against Mr. Ewing in his individual capacity necessarily failed as well, as the trial court concluded. Moreover, appellants also failed to provide support for the contention that, in context, the audience would have understood the accusations against Federal Title to extend to Mr. Ewing himself as a person "solely in charge of corporate decision making . . . ."[22] Indeed, Mr. Ewing is not mentioned in the WAMU article or in the McDermott Will website. As the trial court indicated, Mr. Ewing "and Federal Title are not one and the same in a way that the statements made in relation to Federal Title can be deemed as made to Mr. Ewing as well."

---

[21] The trial court also concluded that Nadel's statements were protected by the fair-report privilege and the judicial proceedings privilege. Because we agree that Nadel's statements could not be understood to have a defamatory meaning, we do not reach these issues.

[22] *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007).

## 2. False Light Invasion of Privacy

"An invasion of privacy-false light claim requires a showing of: (1) publicity; (2) about a false statement, representation, or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be highly offensive to a reasonable person."[23]  Because Nadel's statements were not capable of a defamatory meaning, appellants' claim of false light invasion of privacy also fails.[24]  "[W]here the plaintiff rests both his defamation and false light claims on the same allegations . . . the claims will be analyzed in the same manner."[25]

_____

[23] *Klayman*, 783 A.2d at 613-14.  Appellants' do not contest the trial court's conclusion that a corporation (here Close It! Title Services Inc., d/b/a Federal Title & Escrow Co.) does not have a personal right of privacy to sustain such a claim. *see also* RESTATEMENT (SECOND) OF TORTS § 652I, cmt. c ("A corporation, partnership or unincorporated association has no personal right of privacy.  It has therefore no cause of action for any of the four forms of invasion of privacy. . . .").

[24] *See id.* at 619 ("[S]imilar to our conclusion that the challenged statement did not make Mr. Klayman appear to be odious, infamous or ridiculous, and for the same reasons, we are constrained to agree with the trial court that the statement did not place Mr. Klayman in a 'highly offensive' false light.") (internal citations and quotations omitted).

[25] *Blodgett v. Univ. Club*, 930 A.2d 210, 222-23 (D.C. 2007) (internal citation omitted); *see also Klayman*, 783 A.2d at 619 ("[A] plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion.") (internal citation and quotations omitted).

### 3. Tortious Interference with Business Relations

"A prima facie case of tortious interference with business relations requires: (1) existence of a valid contractual or other business relationship; (2) [the defendant's] knowledge of the relationship; (3) intentional interference with that relationship by [the defendant]; and (4) resulting damages."[26] The trial court dismissed appellants' claims, concluding that they failed to "allege the exact business or contractual relationships that were supposedly damaged by the statements." The trial court further determined that appellants' tortious interference claim was limited to legal conclusions, without supporting factual allegations. To the contrary, we conclude that appellants sufficiently pled this claim, and thus we reverse the dismissal and remand the claim.

In their complaint, appellants represent that, "[o]ver the past twenty years, [they] have established valid contractual and business relationships with lenders, insurers, real estate brokers and homebuyers and sellers." This allegation is sufficient to satisfy the first element of the tort: the existence of a "valid business

---

[26] *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. 2017) (internal citations and quotations omitted).

relationship." Moreover, it has long been established that plaintiffs need not identify specific business relationships or otherwise plead with particularity.[27]

Likewise, appellants satisfied the second element, adequately pleading that appellees knew of Federal Title's array of business relationships by explaining that Federal Title was the largest independently owned and operated title company in the Washington, D.C. area and that appellees chose them, in part, because of that fact.

Covering the third element of tortious interference, appellants pled that appellees' intentional interference with their business relationships was attributable to Nadel's statements, including appellees' awareness of the harm those statements caused. Specifically, the complaint alleged that appellees had been informed of the damage: "On or about August 16, 2017, Plaintiffs . . . notified McDermott and Nadel by letter that [Nadel's] statements were false, constituted defamation per se, and were causing immediate and likely irreparable harm." In addition, appellants alleged that, despite acknowledging receipt of this notice of harm, appellees chose

_____

[27] *See Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 351 (D.C. 2015) ("VLK's argument that Havilah failed to identify specific business relationships can be disposed of by reference to our decision in *Carr v. Brown,* 395 A.2d 79, 84 (D.C. 1978)").

not to retract the statements. These allegations were more than sufficient to satisfy the third element of the tort.[28]

Finally, appellants adequately pled damages, indicating not only injury to their reputations and related emotional distress but also significant financial damage: "Realtors and lenders terminated their business relationships with Plaintiffs. New orders for title services plummeted. Revenues, which had been climbing steadily for years, plunged. The total financial damage to Plaintiffs ultimately will be in the tens of millions of dollars."

_____   _____

[28] To allege the "intentional interference" element of the tort, a plaintiff need not plead that the defendant acted with malice or otherwise wrongfully. *See NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 (D.C. 2008) ("We have never declared it an element of a prima facie case that the defendant's intentional interference be otherwise wrongful."). Instead, it is sufficient that a plaintiff's pleadings reflect that the defendant was certain or *substantially certain* that interference with a business relationship would occur as a result of the defendant's actions (emphasis added). *See Whitt*, 157 A.3d at 203. Accordingly, because Federal Title's pleadings sufficiently alleged appellees' interference with its business relationships, a properly instructed jury could find the requisite "intentional interference" based on appellees' being "substantially certain" that harm to that business would occur as a result of Nadel's statements. *See id.* (explaining that a jury could find that defendants were "substantially certain" they were interfering with plaintiff's business when their construction (outside plaintiff's property) resulted in "obvious obstacles" to reaching her business, and that she had previously complained to them to put them on notice).

For the foregoing reasons, we reverse dismissal of appellants' tortious interference with business relations claim and remand for further proceedings consistent with this ruling.

## B. The District of Columbia's Anti-SLAPP Statute

A strategic lawsuit against public participation, or SLAPP, is "an action filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view."[29] The District's Anti-SLAPP Act provides parties allegedly defending against a SLAPP (e.g., appellees here) with procedural tools to protect themselves from "meritless" litigation – more specifically, to provide expedited protection against harassment for exercising freedom of expression protected by the First Amendment.[30] One of these procedural tools is

_____

[29] *Mann*, 150 A.3d at 1226 (internal quotation marks omitted).

[30] *Id.* at 1226-27; (explaining that the goal of a SLAPP suit "is not to win the lawsuit but to punish the opponent and intimidate them into silence.") (internal citations omitted); *see also Fridman v. Orbis Bus. Intelligence Ltd.*, 229 A.3d 494, 502 (D.C. 2020) (explaining that the Anti-SLAPP Act was created to mitigate the spread of meritless lawsuits designed to "muzzle speech or efforts to petition the government on issues of public interest . . . resulting in a chilling effect on the exercise of constitutionally protected rights.") (internal citations omitted).

the opportunity to file a special motion to dismiss the complaint, in order to bring the swiftest possible end to the litigation.[31]

To support an anti-SLAPP motion to dismiss, the defendant initially must "make[] a prima facie showing that the claim at issue" – here, appellants' complaint – "arises from an act" – here, defendant-appellee Nadel's statements – "in furtherance of the right of advocacy on issues of public interest."[32] Thus, the issue is whether Nadel's statements go to or touch on the essential substantive requirement, an issue of public interest. An "[i]ssue of public interest," defined as "an issue related to health or safety," or "environmental, economic, or community well-being," as well as to "the District government," a "public figure," or a "good, product, or service in the market place."[33] Expressly excluded from this definition are "private interests, such as statements directed primarily toward protecting the speaker's commercial interests rather than toward commenting on or sharing information about a matter of public significance."[34]

---

[31] D.C. Code § 16-5502.

[32] D.C. Code § 16-5502(b).

[33] D.C. Code § 16-5501(3).

[34] *Id.*; *see Saudi Am. Pub. Rels. Affs. Comm.*, 242 A.3d at 611 ("Section 16-5501(3) expansively defines an '[i]ssue of public interest' to encompass issues that

(continued . . .)

Once the issue is definable as a matter of "public," not "private" interest,[35] the kind of "act" that qualifies to further "the right of advocacy on issues of public interest" means:

> (A) any written or oral statement made: (i) in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or (ii) in a place open to the public or a public forum in connection with an issue of public interest.[36]

If the defendant has made the required prima facie showing[37] – which is "not onerous"[38] – "the burden shifts to the . . . plaintiff, who must demonstrate that the

_____

(. . . continued)

'relate[] to' a set of wide-ranging, and somewhat nebulous, categories. . . . This drafting choice indicates both that issues of public interest should be liberally interpreted and that the statements need not explicitly refer to a qualifying topic. Further, although the definition expressly carves out 'private interests,' it does so in a matter that suggests that intermixing public and private interests is not disqualifying. A statement may still relate to an issue of public interest so long as it is not 'directed primarily' at a private interest.").

[35] See text accompanying *supra* notes 33 & 34.

[36] D.C. Code §§ 16-5501(1)(A)(i) & (ii).

[37] See *supra* note 32.

[38] *Doe No. 1 v. Burke* ("*Burke I*"), 91 A.3d 1031, 1043 (D.C. 2014) (internal quotation marks omitted).

claim is likely to succeed on the merits."[39]  If the plaintiff cannot carry this burden,

the defendant's motion must be granted and the lawsuit dismissed with prejudice.[40]

Ruling for the Nadel appellees, the trial court concluded:

> Application of the Anti SLAPP statute is clear[,] . . .
> based on protected speech under the statute as it arises
> from privileged statements made by Mr. Nadel to a
> WAMU reporter after the filing of the underlying federal
> lawsuit. The issue is included as one of public interest
> under the broad reading permitted by the statute, which
> relates to potential concerns regarding cybercrime.

To the contrary, appellants Federal Title and Ewing argue that the trial court erred

in ruling they had filed a SLAPP complaint that arose from an "act" (Nadel's

statements) allegedly "in furtherance of the right of advocacy on issues of public

interest."[41]  They stress that Nadel's statements "primarily" served not "public

interests" but, rather, the "private interests"[42] of the appellee lawyers and clients in

pursuit of the $1.5 million allegedly lost, if not stolen, by Federal Title and Ewing.

---

[39] *Mann*, 150 A.3d at 1227 (quoting D.C. Code § 16-5502(b)).

[40] D.C. Code §§ 16-5502(b), (d).

[41] D.C. Code §§ 16-5501(1)(A)(i) & (ii), 16-5502(b).

[42] See *supra* note 34 and accompanying text.

Accordingly, conclude appellants, the defendant-appellees failed to make the required prima facie showing that justified granting their anti-SLAPP motion to dismiss.

We begin the analysis with appellees' contentions in support of the trial court's ruling. Their fundamental argument, premised on D.C. Code § 16-5501(1)(A)(ii), relies on the appearance of Nadel's statements in WAMU's article (presumably appearing in a "public forum")[43] which addresses cybercrime: "Hackers Allegedly Steal $1.5 Million from D.C. Couple In Home-Buying Phishing Scheme." They assert the trial court correctly determined that they had made the essential prima facie showing that "Nadel's statements dealt with . . . several issues of public concern, including title services in the District and cybercrime." To emphasize the point, appellees reference a quotation in the WAMU article from a Federal Title employee who said that the incident in which Smith and Wrona lost $1.57 million "should serve as a reminder to the public about the importance of cybercrime awareness and education." And, in their brief

_____

[43] See text at *supra* note 36: "(A) any written or oral statement made: . . . (ii) in a place open to the public or a public forum in connection with an issue of public interest." Appellants do not dispute that the article appeared in a "public forum."

on appeal, appellees cite various articles about "email fraud and real estate transactions."

This argument does not persuade. Nadel's statements did not address cybercrime, email fraud, or real estate transactions; as appellants maintain, his statements were related "primarily" to a private dispute[44] about responsibility for the loss of $1.57 million belonging to Nadel's clients, Smith and Wrona. Nadel's statements in the article at issue, first published by WAMU both on the air and on its website – and followed by McDermott Will's republication on its own website – focused *not* on the overall "hacking" or "cybercrime" theme of the article but rather, and far more narrowly, on publicizing the alleged responsibility of Federal Title and Ewing for his clients' missing $1.57 million. WAMU is not named as a defendant in this case; there is no allegation that Nadel was even aware that the WAMU reporter was intending to highlight "hacking"; and the only statements at issue are Nadel's, not those of WAMU and its reporter, or of the employee who spoke about cybercrime for Federal Title. In fact, Nadel deflected discussion from any broader, cybercrime issue to a focus exclusively on Federal Title's alleged culpability, stating: "We don't have any evidence that it happened because of hackers other than Federal Title's say so."

_____

[44] D.C. Code § 16-5501(3); see *supra* note 34 and accompanying text.

In sum, we cannot interpret Nadel's statements as relating to an issue of public interest simply because they appear in an article featuring the issue of cybercrime, which Nadel himself does not address. Neither can it be said that Federal Title and its principal, Todd Ewing, filed their claim as parties on "one side of a political or public policy debate"[45] about "cybercrime" or any other issue of public interest, as required for a SLAPP lawsuit.[46] Indeed, the only "debate" the parties were engaged in was over who was responsible for Smith's and Wrona's missing funds and by what means; Nadel expressed no opinion about cybercrime or any other public matter.[47] Nadel's statements, rather, were directed primarily at protecting his clients' (and thus his own) commercial interests, which are not protected under the Anti-SLAPP Act.[48]

---

[45] *Mann*, 150 A.3d at 1227 (quoting D.C. Code § 16-5502(b)).

[46] *Id.*

[47] *Cf. Saudi Am. Pub. Rels. Affs. Comm.*, 242 A.3d at 612-13 (concluding that, although the speaker's statements were primarily directed at another individual, the statements were related to the public interest issue of community well-being, as they were "made in the context of a firestorm . . . between two competing Mid-East special interest groups" about "who should participate in a major policy conference about religious tolerance in the Muslim world.") (internal quotations and citations omitted).

[48] See *supra* note 34 and accompanying text.

Appellees, however, attempt to buttress their "public interest" (cybercrime) argument, based on § 16-5501(1)(A)(ii), by relying on a companion provision, § 16-5501(1)(A)(i).[49] They say that this provision alone justifies a finding that Nadel's statements, overall, comprised an "[a]ct in furtherance of the right of advocacy on issues of public interest" simply because those statements were made about a situation under review by a "judicial body,"[50] namely Smith's and Wrona's RICO case pending at the time in federal district court.

Subsection (i), however, makes no reference to what an "issue of public interest" is. As we noted with reference to subsection (ii), that definition is found exclusively in a subsequent, "related paragraph"[51] of the Act. Section 16-5501(3) defines an "issue of public interest" as an issue limited to "health or safety; environmental, economic, or community well-being; the District government; a

_____

[49] See text at *supra* note 36: "(A) any written or oral statement made: (i) in connection with an issue under consideration or review by a legislative, executive, or *judicial body* (emphasis added).

[50] *Id.*

[51] *See Thomas v. United States*, 171 A.3d 151, 153 (D.C. 2017) ("Interpreting a statute . . . is a holistic endeavor, whereby we consider a statute in the context of its entire statutory scheme and the language of surrounding and related paragraphs.") (internal quotations marks omitted).

public figure; or a good, product, or service in the market place."[52]  To accept appellees' interpretation of § 16-5501(1)(A)(i), therefore, would be to accept that someone could perform an "act in furtherance of the right of advocacy on an issue of public interest" simply because the matter was under consideration by a "judicial body," without regard to whether it was limited to § 16-5501(3) criteria.

If, as appellees contend, the only requirement for an issue of "public interest" were to be its consideration "by a legislative, executive, or judicial body,"[53] or its appearance in a "place open to the public or a public forum"[54] – thus leaving wide open how "public interest" is to be defined – then subsection (3) of the Act, which comprehensively defines (and thus limits) an "issue of public interest," would be "redundant or superfluous,"[55] an untenable situation.[56]

_____

[52] D.C. Code § 16-5501(3).

[53] D.C. Code § 16-5501(1)(A)(i).

[54] D.C. Code § 16-5501(1)(A)(ii).

[55] *See Crawford v. District of Columbia*, 891 A.2d 216, 220 (D.C. 2006) (It is a "basic principle of statutory interpretation that a court must give effect to all of the provisions of [a statute], so that no part of it will be either redundant or superfluous.") (internal quotations omitted).

[56] Even if, as to the meaning of the phrase "issue of public interest," subsections (1) and (3) were in irreconcilable conflict, the more specific language of subsection (3) would lead us to the conclusion we reach here. *See George Washington Univ. v. District of Columbia. Bd. of Adjustment*, 831 A.2d 921, 943

(continued . . .)

Accordingly, we cannot agree that subsections (i) and (ii) of § 16-5501(1)(A), standing alone, add any substance to the meaning of "public interest"; they do not independently justify a conclusion that Nadel's statements were made "in furtherance of the right" of public interest advocacy.[57]  Rather, those subsections necessarily incorporate the "public interest" criteria specified in § 16-5501(3), which does not include Nadel's statements limited to support of a private interest: his clients, Smith and Wrona.

Notwithstanding the broad scope of "an issue of public interest," which should be "liberally interpreted" under the Anti-SLAPP Act when addressing each criterion specified in § 16-5501(3),[58] we must conclude that appellees have failed to make a prima facie showing that Nadel's statements – nowhere embraced by any language in that subsection – were "in furtherance of the right of advocacy on

_____

(. . . continued)
(D.C. 2003) (explaining that, if statutory language conflicts, the more specific governs the more general one).

[57] D.C. Code § 16-5501(3).  The predominance of subsection (3) in defining "issue of public interest" is consistent with the legislative history of the Anti-SLAPP Act, which makes clear that the statute is intended to prevent litigation designed to "stop citizen[s] from exercising their political rights," D.C. Council Comm. Rep. B. 18-893, at 2 (D.C. Nov. 18, 2010), not to shield them from accountability for alleged defamation and other tortious conduct.

[58] *Saudi Am. Pub. Rels. Affs. Comm.*, 242 A.3d at 611.

issues of public interest."[59]  Accordingly, appellees' special anti-SLAPP motion to dismiss should have been denied, and the trial court's decision to award relevant attorneys' fees and costs[60] must also be reversed.[61]

## IV. Conclusion

For the foregoing reasons, we (1) affirm the trial court's orders denying appellants' defamation and false light claims, (2) reverse the court's order denying appellants tortious interference with business relations claim, and (3) reverse the court's order granting appellees' special motion to dismiss pursuant to the Anti-SLAPP Act and related attorneys' fees.  Accordingly, we remand the case for further proceedings consistent with this opinion.

*So ordered*.

_____

[59] D.C. Code § 16-5502(b).

[60] *See* D.C. Code § 16-5504.

[61] Because we conclude that appellees have not met their burden to establish an Anti-SLAPP case, appellants' claim that they were wrongfully denied targeted discovery under the Act is moot.